

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-433-CV

W.L. LINDEMANN OPERATING
COMPANY, INC.
APPELLANT

V.

JOYCE STRANGE, INDIVIDUALLY
AND AS TRUSTEE FOR THE JOYCE
STRANGE MARITAL TRUST
APPELLEE

------------

FROM THE 97TH DISTRICT COURT OF ARCHER COUNTY

------------

## OPINION

------------

This is an appeal from a jury verdict in favor of appellee Joyce Strange, individually and as Trustee for the Joyce Strange Marital Trust, in a case involving production from an oil lease in Archer County, Texas.  In five issues, appellant W.L. Lindemann Operating Company, Inc. contends generally that the evidence is legally and factually insufficient to support the jury's findings on

willful commingling, fraud, and damages.  We affirm in part and reverse and render in part.

**Background Facts**

Appellee was married to Doug Strange for over twenty years.  Strange developed and operated oil leases; appellee worked for him as a bookkeeper.  Strange did business through Brock & Strange Oil Company, a partnership between him and Joe Wayne Brock.  Beginning in the 1960s, Brock & Strange developed leases and drilled oil wells with W.L. "Rusty" Lindemann.  Although their businesses were separate, according to appellee, her "husband would drill a well and Rusty would take an interest" in it.

Rusty and Strange verbally agreed that Rusty would drill and operate a well in Archer County on one of Strange's leases known as the D.D. Strange.  Strange gave Rusty a fifty percent working interest in the lease.[1]  Rusty drilled the first of two wells on the D.D. Strange in 1991; Strange passed away in 1992.  Upon Strange's death, appellee acquired his working interest and a

---

[1] He also gave a 1/16th working interest to Brock.  Appellee's counsel clarified with appellee that when the parties referred to a "working interest," "that means you pay part of the expenses and you get part of the proceeds." And when they referred to a royalty interest, "that means you own the minerals under the land and you've leased those minerals and you get a part of the proceeds but you don't have to pay the day-to-day working expenses like insurance and overhead and electricity and fuel and repair parts."

royalty interest in the wells, individually and as a beneficiary of the Joyce Strange Marital Trust, through inheritance from her husband's estate. Appellee also took over his interest in Brock & Strange. Rusty continued to operate the D.D. Strange, through appellant,[2] after appellee acquired these interests.

After Rusty drilled the first well on the D.D. Strange, he also began to develop and operate the Powell lease located to the north of the D.D. Strange. Rusty and his family members own 7/8ths of the working interests in the Powell.[3] Around the same time, Rusty's son Doug Lindemann began to develop the Hoff lease, located to the east of the D.D. Strange. Rusty's sons William, Robert, and other family members own all the working interests in the Hoff. To the south of the Hoff is the O'Keefe "B" lease, which Rusty also operated and in which he owned an approximately one-half working interest.[4] Brock & Strange also owns interests in the O'Keefe.

Appellee testified that she did not have any contact with Rusty about the D.D. Strange wells between 1991 and 2000. Brock, who acted as

---

[2] Rusty testified at trial that he formed appellant in 1994 and that appellant took over operations of his leases.

[3] Appellee and Brock each own a 1/16th working interest in the Powell.

[4] Rusty also operated the Kinsey lease west of the D.D. Strange and the Mullis lease north of the Powell. A map showing the location of the various leases is appended to this opinion as Attachment "A".

3

superintendent on the Brock & Strange leases, informed her about matters related to the D.D. Strange. According to appellee, Brock "takes care of all the leases. He goes out and checks them and makes sure they're all pumping properly and just takes care of all the field superintendent work." Conoco purchased production on the D.D. Strange while it was producing.

In 2000, appellee and Brock became concerned about the D.D. Strange because, according to appellee, "[i]t quit producing oil." Appellee said she found out about this because she stopped "getting an oil run[5] out from the oil companies." Brock checked both wells on the D.D. Strange;[6] they looked as if they had been shut in for some time.[7] Brock and appellee talked about the

---

[5] Appellee explained that "no oil was being run out from under [her] lease."

[6] Brock testified that he checked the O'Keefe first and that the irregularities he found there made him suspicious about the D.D. Strange. For instance, he found new tong dyes (equipment used on the oil wells) in one of the O'Keefe well casingheads that should not have been there. In addition, the O'Keefe was producing oil, but Brock & Strange had not been getting any money from production. When he confronted Rusty about this, Rusty told him the oil had been "misplaced" and that it had been run on a different lease Rusty owned; Rusty paid Brock & Strange for the "misplaced" oil. Brock & Strange took over operating the O'Keefe in the latter part of 2001.

[7] There is conflicting evidence as to whether the wells were "shut in," that is, not producing in paying quantities, or whether they were simply pumped only long enough to produce the minimum amount of paying quantity per month. Nevertheless, it is clear that production from the D.D. Strange decreased significantly between 1998 and the early part of 2001.

4

problem and then went to the lease together to investigate. When Brock and appellee opened one of the valves on the well, according to appellee, "oil just gushed out . . . like gangbusters." Additionally, the screw that held the lever properly on the saltwater separator,[8] or saltwater knock-out,[9] was not there.

Appellee then contacted counsel to "get [her] lease back." Appellee's attorney was able to negotiate a deal with Willowbend Investments—a company owned by Lee Murchison and Rusty's son William, to whom Rusty had transferred his interest in the D.D. Strange effective March 1, 2001. Willowbend let Brock & Strange take over operation of the D.D. Strange, and Willowbend transferred at least some of its interest in the D.D. Strange to appellee.[10]

Before Brock & Strange took over the lease, it was producing "about nothing." After they took over operation of the lease, according to appellee, "Brock went down and flipped a switch[,] and it started gushing like it should have to begin with." Additionally, about a month later, Brock acidized the well,

---

[8] A separator is a device that separates the oil and water pumped from a well.

[9] These terms are used interchangeably in the record.

[10] Appellee testified that she purchased Murchison's interest but then assigned him half of what he had conveyed to her. It is unclear who owned all the working interests in the D.D. Strange, and in what amount, after the transfer.

5

and "production has been going up ever since." The evidence at trial confirmed that production on the D.D. Strange increased significantly after Brock & Strange took over operating the lease.

Appellee filed suit against appellant in 2001, claiming, in appellee's words, that Rusty and appellant "shut down [her] lease[,] . . . pumped all the leases around [her,] and just took the oil out from under [her] lease." A jury trial began October 11, 2005, upon appellee's fourth amended petition, in which she specifically alleged that appellant either drained oil from beneath the D.D. Strange, failed to properly produce the D.D. Strange and O'Keefe leases, or both. She also alleged causes of action for fraud, conspiracy, negligent misrepresentation, conversion, civil theft under section 134.001 of the civil practice and remedies code, unjust enrichment, breach of contract, fraudulent concealment, and wrongful commingling. She requested actual damages, the imposition of a constructive trust, exemplary damages, and attorneys' fees.

On October 17, 2005, after appellee had rested her case, appellant filed a motion for instructed verdict as to all of appellee's claims. The trial court granted the motion as to appellee's conspiracy, civil theft, and unjust enrichment claims and her contention that appellant improperly reported the quantity of oil produced from the D.D. Strange and O'Keefe leases to the Texas Railroad Commission. But the trial court denied the motion as to all other

6

claims. Appellant also filed a motion for instructed verdict on appellee's fraud, conversion, and willful commingling claims after the close of its evidence, which the trial court denied as to all claims.

The jury found that substantial drainage had occurred from the D.D. Strange lease and that appellant had failed to act as a reasonably prudent operator by failing to prevent substantial drainage from the D.D. Strange. It awarded appellee past damages of $66,093.00 as to her royalty interest in the lease and $642,959 in past damages as to her working interest.[11] The jury also found that no substantial drainage had occurred from the O'Keefe lease. The jury additionally found that appellant had willfully commingled the oil production from the D.D. Strange, Powell, and Hoff leases, causing damages to appellee of $1,627,300. Although the jury found that Rusty individually did not commit fraud against appellee, it did find that appellant committed fraud; the jury awarded appellee compensatory damages of $233,300 and exemplary damages of $200,000. Finally, the jury found that appellee was entitled to reasonable attorneys' fees of $160,000 for trial, $10,000 for an appeal to the court of appeals, and $10,000 for an appeal to the Supreme Court of Texas.

---

[11] These damages are the total amount calculated by appellee's expert from May 1991 through February 2001.

7

Appellee moved for judgment on the jury's verdict, and appellant moved to require appellee to elect a remedy as to either her fraud or drainage claims because both claims were based on the facts underlying appellee's drainage claim. Appellant also moved to disregard the jury's findings of substantial drainage and damages for that cause of action, willful commingling and damages for that cause of action, and fraud and the actual and exemplary damages for that cause of action; appellant moved to disregard the jury's findings on attorneys' fees as well.

The trial court entered a final take-nothing judgment in Rusty's favor and severed it from the pending suit.[12] It also entered an order recognizing that appellee had elected to proceed on her fraud claim as opposed to her drainage claim; thus, the trial court disregarded the jury's findings as to wrongful drainage.[13] The trial court additionally granted appellant's motion to disregard

---

[12] Appellee has not appealed the judgment in Rusty's favor.

[13] The jury awarded appellee the entire amount of damages that her expert attributed to wrongful drainage during the time period from May 1991 through February 2001; however, because the jury also found that only appellant, not Rusty individually, had substantially drained the D.D. Strange, appellee was entitled to recover damages only from July 1, 1994 through February 2001. After the damages attributable to the time period before appellant operated the D.D. Strange are subtracted, appellee's recovery on the drainage claims would be only $282,463.93.

the jury's findings as to attorneys' fees; however, it denied the motion as to all of appellee's other claims.

On August 28, 2006, the trial court entered a "Judgment on the Verdict." In it, the court ordered that appellee recover $1,860,600 from appellant in actual damages and $200,000 in exemplary damages. It also awarded prejudgment and postjudgment interest at the rate of 8.25% and assessed costs against appellant. Appellant filed a timely notice of appeal.

**Issues Presented**

In five issues, appellant contends that the evidence is legally and factually insufficient to support the following jury findings: (1) that appellant willfully commingled oil from the D.D. Strange lease with oil from the Powell and Hoff leases, (2) that appellant committed fraud, (3) that appellee was damaged in the amount of $1,627,300 for the willful commingling, (4) that appellee sustained damages in the amount of $233,300 for the fraud, and (5) that appellee is entitled to exemplary damages of $200,000.[14] We will first address

---

[14] Appellant also brings two contingent issues, challenging the jury's findings on wrongful drainage and attorney's fees in the event appellee attempts to challenge the trial court's ruling as to those findings. Appellee responds to the contingent issues, contending that the jury's findings as to wrongful drainage and attorneys' fees were proper. However, we do not address these issues because appellee did not file a separate notice of appeal challenging the trial court's decision to disregard these findings. *See* TEX. R. APP. P. 25.1(c); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex.

9

appellant's second issue related to the jury's fraud findings because the fraud evidence is also relevant to appellee's wrongful commingling claim.

## Legal and Factual Sufficiency Standards of Review

### Legal Sufficiency

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

---

2001); *Pettus v. Pettus*, 237 S.W.3d 405, 421-22 (Tex. App.—Fort Worth 2007, pet. denied).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

Any ultimate fact may be proved by circumstantial evidence. *Russell v. Russell,* 865 S.W.2d 929, 933 (Tex. 1993). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case. *Id*. However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995).

**Factual Sufficiency**

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set

11

aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

**Exemplary Damages Standard of Review**

To be entitled to an award of punitive damages, appellee had to prove by clear and convincing evidence that the harm with respect to which she seeks recovery of exemplary damages resulted from fraud or malice committed by appellant. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon Supp. 2007). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. CIV. PRAC. & REM. CODE ANN § 41.001(2) (Vernon Supp. 2007); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no

requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that its finding was true. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). We must review all the evidence in the light most favorable to the finding. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must consider, however, undisputed evidence even if it is contrary to the finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *Hall*, 168 S.W.3d at 170. That is, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *Wilson*, 168 S.W.3d at 827.

**Jury Charge**

Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000). However, when a party properly objects to a jury question, we review the sufficiency of the evidence in light of the charge the trial court should have submitted. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2003); *Allen v. Am. Gen. Fin., Inc.*, No. 04-06-00273-CV, 2007 WL 4180145, at *8 (Tex. App.—San Antonio Nov. 28, 2007, pet. filed).

### Fraud

In its second issue, appellant contends that the evidence is legally and factually insufficient to support the jury's findings that appellant committed fraud against appellee and that appellee proved by clear and convincing evidence that the fraud caused her harm. Generally, appellant contends that the evidence shows only that it engaged in good faith business practices typical of the oil and gas business in Archer County. Specifically, appellant claims that the evidence is insufficient to support the required mental state for fraud and the element of reliance by appellee; it also challenges evidence of discrete acts, standing alone, as supporting the fraud claim. For example, appellant contends

14

that the following evidence is insufficient to support a fraud finding: (1) evidence that Brock found a bypass hose on the D.D. Strange No. 1 well that allowed oil produced from the No. 2 well to go back down into the ground through the No. 1 well, (2) evidence of appellant's use of electricity from appellee's wells to operate another well without appellee's consent or knowledge, (3) evidence that appellant continued to bill appellee for operating costs on the D.D. Strange even during the period when it was pumping the well only once per month, and (4) evidence that Rusty told Brock that he was waiting on the success of a water injection before beginning to pump the D.D. Strange wells again.

**Applicable Law**

A party commits fraud by (1) making a false, material misrepresentation (2) that the party either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it (5) and is injured as a result. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (op. on reh'g); *Reynolds v. Murphy*, 188 S.W.3d 252, 270 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g), *cert. denied*, 127 S. Ct. 1839 (2007). Thus, a statement is not fraudulent unless the maker knew it was false when he made

15

it or made it recklessly without knowledge of the truth. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied,* 498 U.S. 1048 (1991).

A misrepresentation may also consist of the concealment or nondisclosure of a material fact when there is a duty to disclose. *Custom Leasing, Inc. v. Tex. Bank & Trust Co*., 516 S.W.2d 138, 142 (Tex. 1974); *Reynolds*, 188 S.W.3d at 270. The duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth. *Reynolds*, 188 S.W.3d at 270. Whether a duty to disclose exists is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001); *Reynolds*, 188 S.W.3d at 270.

Fraud is usually not discernible by direct evidence and is usually so covert or attendant with such attempts at concealment as to be incapable of proof other than by circumstantial evidence. *Cotten v. Weatherford Bancshares, Inc*., 187 S.W.3d 687, 707 (Tex. App.—Fort Worth 2006, pet. denied); *see Spoljaric v. Percival Tours, Inc*., 708 S.W.2d 432, 435 (Tex. 1986); *Weinberger v. Longer*, 222 S.W.3d 557, 562 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Motive, past conduct, and related wrongful acts are thus factors to be considered. *Cotten*, 187 S.W.3d at 707.

16

**Applicable Facts**

Appellee's theory at trial was that appellant committed fraud by misrepresenting why the D.D. Strange wells were not producing, by failing to tell appellee that it was not producing the wells, and by concealing a bypass hose and a separator malfunction[15] on the wells. Appellee contended that all of these contributed to oil in the underlying formation being diverted—or drained—from under the D.D. Strange so that it could be produced from the Powell, the Hoff, or both—leases in which Rusty or his children had the majority interests.

The evidence showed that in 1993, the D.D. Strange wells produced 3,629 barrels of oil, and in 1994, they produced 1,162 barrels. In 1995, the production dropped to 573 barrels and kept steadily declining so that in 1999, they produced 77 barrels, and in 2000, they produced only 48. But in 2001, the year Brock & Strange took over operation of the D.D. Strange, the wells produced 979 barrels: 962 in June through December when Brock & Strange operated the lease,[16] 15 between March and May, when Willowbend operated

---

[15] The evidence regarding the bypass hose and separator is discussed at length in the following discussion of appellee's first issue regarding willful commingling.

[16] The lease produced 30 barrels the first month Brock & Strange took over operations.

the lease, and 2 barrels in January and February of that year when appellant operated the lease.  The next year Brock & Strange produced 1,746 barrels.  The parties introduced conflicting evidence for the decline and subsequent increase in production from the D.D. Strange.

Rusty testified that he owned a one-half working interest in the D.D. Strange when he operated it.[17]  He also testified that his sons owned the majority of the working interests in the Hoff.  According to Rusty, some of the wells in the area produced better than others, and the D.D. Strange wells were not good producers after 1995.  Rusty testified that when he first started decreasing production on the D.D. Strange, he pumped the wells once a week at first, then once a month when the price for a barrel went down to $9.[18]  He wanted to continue holding the lease, that is, producing it in paying quantities, but he did not want to expend more money in producing it than it would make in revenue.

---

[17] The operator controls production on and makes day-to-day decisions regarding the lease.

[18] The evidence shows that oil prices were around $9-$11 a barrel from December 1998 through January 1999.  Appellant introduced into evidence a letter from Brock & Strange written around this time stating that due to the decline in oil prices, Brock & Strange were going to pump another of its leases, the Strange Fee "B" lease, only once per week.

18

Although Rusty testified initially that he started cutting back production on the D.D. Strange around the time oil prices were $9 a barrel—which the evidence shows was in December 1998 and January 1999—he later testified that the production in 1998, 1999, and most of 2000 was the natural production on the D.D. Strange and that that was all it was capable of producing. He then testified that he started cutting back production in October 2000 because of the decrease in oil prices.

Rusty admitted that he did not decrease production from the Powell during this time, nor did his son Doug decrease production from the Hoff. In addition, contrary to Rusty's testimony, the evidence shows that after the December 1998-January 1999 low, oil prices began steadily increasing, and by October and November 2000 they were higher than they had been since at least May 1991 (the earliest date in the record).

According to Rusty, appellee and Brock had complained about the operating expenses for the wells. But Rusty also testified that he made the decision to decrease production himself; he never consulted Brock. He agreed that even though the D.D. Strange was the only lease in the area losing money, he kept billing appellee for the operating expenses, and he never attempted to

acidize the wells.[19]  He did acidize the Powell around the same time, however.

Rusty at first said that Brock did not want to acidize the well because of the

expense but later testified that he never asked Brock because of the expense.

Brock testified that he did not have any conversations with Rusty about

expenses on the D.D. Strange before its wells were shut in and that the only

conversation they later had about expenses was about Brock & Strange being

charged for operating expenses while the wells were not being produced.

Rusty admitted that instead of telling Brock or appellee that he had decreased

production on the D.D. Strange due to expenses, he told Brock that he was

"waiting on the water to hit" from one of the wells on the Hoff.[20]  Brock

understood this to mean that Rusty was waiting for the zone to be

repressurized by the water being put into one of the Hoff wells, which he hoped

---

[19] Acidizing is a technique to increase oil production.  It consists of pumping acid into the well, which cleans out the well and the underlying formation.

[20] There is some confusion in the record as to whether the well on the Hoff was an injection well or merely a disposal well.  Rusty testified that an injection well puts more water into the underlying formation than it takes out, but a disposal well simply disposes of the same amount of water that the wells produce along with any oil.  The purpose of an injection well is to increase production from a formation once it has already produced all the oil that it will produce naturally; it is a secondary recovery technique, in the same vein as acidization.

would cause the other wells to produce more oil.  However, Rusty also testified that he did not operate an injection well in the area and that he never had.

When Brock told Rusty in October 2000 that he had been to the D.D. Strange and oil had flowed out of the casingheads of one of the wells, Rusty told Brock he did not know what he was talking about.  Rusty said that in response to Brock's telling him this, he went to the lease, and a little gas came out of the well, so he started producing it.  However, Rusty also testified that the well would not produce more than one barrel per day and that if Brock had been telling the truth about oil coming out of the top of the casing, there would have been forty barrels of oil in the casing.

After Brock told Rusty that appellee wanted to produce the lease, Rusty sold his interest to Willowbend.  Rusty did not keep any records; however, he claims he gave them all to Murchison, who owned Willowbend with Rusty's son William.

Rusty admitted that he had used electricity from the deep wells on the O'Keefe[21] without permission to power one of his shallow wells; however, during this time, he also continued to bill the deep well owners for all the

---

[21] There were two levels of mineral interests on the O'Keefe:  interests in the shallow formation and interests in the deeper part of the formation. Rusty owned the shallow interests and part of the deep interests, along with Brock & Strange, among others.

21

electricity.   According to Rusty, even though he did not talk to the lease owners and obtain their permission to use the electricity at their expense, he also did not charge them for disposing of water on his shallow lease.  He explained, "We just kind of worked together on them things."  Brock testified that he discovered this "misuse of electricity" shortly after Brock & Strange took over operations on the O'Keefe.  According to Rusty's son Robert, however, the electricity usage was temporary in 1996 or 1997 and lasted only for about a month or less.

Appellee introduced expert testimony that the sands in the formation underlying the wells in the D.D. Strange, Powell, Hoff, and O'Keefe areas communicated; that is, that oil could move from one well to another if some wells were produced more than others.  She also introduced expert testimony that appellant did not produce the D.D. Strange to its productive capacity, that the Hoff produced more than its share of the original oil in place, and that the D.D. Strange had a much lower recovery than some of the other leases in the same reservoir.[22]

---

[22] Appellee's expert Keith Masters calculated the original oil in place under the reservoir and how much of that was attributable to each lease, then calculated how much of the original oil in place was produced from each lease. He then determined how much each lease actually produced.  For example, while he determined that the Hoff had 16.4% of the original oil in place in the reservoir, it actually produced 88.4% of the oil, or 56.9% of the reservoir,

**Analysis - Falsity of Statement and Mental State**

Appellant contends that there is no evidence or insufficient evidence that Rusty's statement that he was waiting on the water to hit was false—or that Rusty intentionally or recklessly misrepresented to Brock or appellee why he was not producing the D.D. Strange—because there is no or insufficient evidence that Rusty did not really believe that a water injection would increase production. Appellant points to the following evidence as showing that Rusty could have believed that an injection would increase production on the D.D. Strange: "undisputed" evidence that one of the wells on the O'Keefe was being operated as an injection well; Masters's testimony that the D.D. Strange had exhausted its primary productive capacity in 1996; Rusty's and Robert's testimony that they unsuccessfully tried to produce the D.D. Strange when Brock told Rusty that there was oil coming out of the casinghead on the No. 2 well; and other evidence that the D.D. Strange was capable of producing only one barrel a day during this time.

---

while the D.D. Strange, which had 8.5% of the original oil in place, produced 7.3% of the original oil in place or only 2.4% of the reservoir. Masters testified that the Hoff could not have produced that much of the original oil in place in the reservoir absent a drainage. He also attributed the increase in production of the D.D. Strange when Brock & Strange took over to its being continuously produced.

23

Appellant contends that there is undisputed evidence that one of the wells on the O'Keefe was being used as an injection well. There is indeed evidence that one of the O'Keefe wells was permitted as an injection well, and Masters testified that the O'Keefe No. 3 well was injected beginning in January 1996, according to Texas Railroad Commission records. But Rusty testified that he had never operated a waterflood, or injection well; according to Rusty, the O'Keefe well merely disposed of water produced from a different lease, the Stallcup, and not any additional water for the purpose of promoting secondary recovery.[23] An inference can be made from Masters's testimony that the O'Keefe No. 3 was injected until October 2001; he testified that when Brock & Strange took over and moved injection to the No. 4 well—in accordance with the permit—production in the reservoir decreased rather than holding steady as it had been doing. Thus, there is conflicting evidence as to whether there were any injections on the O'Keefe around the time Brock said Rusty told him he was waiting on the water to hit. More importantly, both Brock and Rusty testified that Rusty's statement referred to injection of one of the *Hoff* wells. The Hoff well was not injected until August 2001.

---

[23] Rusty had testified earlier that he had *planned* to do a waterflood someday.

Additionally, although Masters did testify that the D.D. Strange had reached its primary production limit in 1996, he also attributed the dramatic increase in production after Brock & Strange took over to the fact that it was again being continuously pumped. Masters further testified that while any injection on the O'Keefe benefitted the Hoff and Powell leases, it did not benefit the D.D. Strange. In other words, while the rest of the reservoir had benefitted from the O'Keefe injection, the D.D. Strange did not because it was not being pumped.[24]

Finally, Rusty's own testimony regarding his reasons for decreasing production is at odds with appellant's theory that Rusty genuinely believed that an injection would increase production on the D.D. Strange. Although the D.D. Strange produced only 7 barrels in December 1998 and 6 barrels in January 1999—when prices were hovering around $9 a barrel—between October 2000 and February 2001, when it was producing only one barrel each month, oil prices were higher than they had been since at least 1991. And Rusty admitted that appellant and Doug did not cut back production on the Powell and Hoff

---

[24] Appellant attempts to attribute the dramatic increase in production on the D.D. Strange after Brock & Strange took over solely to the acidization performed in July 2001. But in May 2001, Willowbend pumped 13 barrels, and in June 2001, the first month Brock & Strange operated the lease, it produced 30 barrels.

during the same time. Finally, Rusty said that after Brock told him in October 2000 that oil was coming out of the well casingheads on the D.D. Strange, he produced the wells, but they would pump only one barrel per day. The evidence of the D.D. Strange's actual production contradicts this, however; it shows that between October 2000 and February 2001, the last months appellant operated the lease, it produced only 1 barrel per *month*. Thus, all of appellant's attempted explanations for the lack of production on the D.D. Strange are, at best, inconsistent, and the jury was entitled to disbelieve them. *See Wilson*, 168 S.W.3d at 827.

Moreover, the surrounding circumstances also support an inference that Rusty knew the statement was false, or was at least reckless in making it. When Brock started investigating what was going on, Rusty sold his interest in the D.D. Strange to a third party, Willowbend, in which his son William was a partner. Rusty did not keep any records regarding the D.D. Strange. In addition, evidence of other irregularities on the leases operated by appellant—for example, the use of electricity from the O'Keefe deep well owners and the use of the O'Keefe No. 3 well as the injection well even though the No. 4 was listed on the permit—combined with the fact that appellant is operated by family members of the surrounding lease owners (and by persons who also own interests in the surrounding leases), supports the conclusion that

26

Rusty's statement to Brock that he was waiting on the water to hit was intentionally or recklessly false.

We conclude and hold that there is both legally and factually sufficient evidence to prove that Rusty's statement to Brock was false and that it was made intentionally or with reckless disregard for the truth.

**Analysis - Reliance**

Appellant also contends that the evidence is legally and factually insufficient to prove reliance because Rusty made his statement to Brock, not appellee. In addition, appellant contends that appellee could not have relied on Rusty's misrepresentation to her detriment because Brock continued to investigate the reason for low production on the leases.

Texas does not require privity to establish fraud. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578, 580 (Tex. 2001) ("Our fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person and induce reliance."). To prove that an alleged fraudfeasor had reason to expect reliance,

> [t]he maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their

27

conduct. There must be something in the situation known to the maker that would lead a reasonable man to govern his conduct on the assumption that this will occur. If he has the information, the maker is subject to liability under the rule stated here.

*Id*. at 581 (quoting RESTATEMENT (SECOND) OF TORTS § 531 cmt. d (1977)).

Here, the parties had been doing business together for thirty to forty years. Appellant operated numerous wells in a small area in which appellee, Brock, and Rusty all held working interests. Brock and Rusty were friends, and Rusty and appellee's husband had worked on twenty to twenty-five wells together. After Strange passed away, Rusty had some business dealings with appellee regarding the leases. He dealt regularly with Brock regarding operational details of the leases. Moreover, when asked at trial why he shut in the D.D. Strange, Rusty testified, "that's all I could do because *they* was complaining about the costs." [Emphasis added.] Thus, the evidence shows that Rusty would have known that the information he told Brock would reach appellee for the purpose of influencing her conduct.

As to whether appellee relied on Rusty's misrepresentation to her detriment, Brock testified that he had a conversation with Rusty about why the D.D. Strange wells were shut in; he did not say when that conversation occurred. Brock did not start investigating the D.D. Strange until after he began investigating the O'Keefe in 2000. Brock also testified that when he had

28

questioned Rusty about the expenses being charged for operating the D.D. Strange while it was shut in, he just accepted Rusty's answer. Brock had trusted Rusty.

Appellant contends that the evidence shows that Brock continued investigating the D.D. Strange issues after Rusty told him he was waiting on the water to hit; thus, there is no evidence that appellee could have relied on Rusty's statement to her detriment. But it is a reasonable inference from Brock's testimony that he and Rusty had the conversation about the water *before* Brock started investigating the D.D. Strange and that Brock and appellee relied on Rusty's statement for at least some time. Brock testified that he did not even begin investigating the D.D. Strange until *after* he had found irregularities on the O'Keefe. Thus, we conclude and hold that the evidence is legally and factually sufficient to prove appellee's reliance on Rusty's material misrepresentation.

For the same reasons, we also conclude and hold that the evidence is legally and factually sufficient under the clear and convincing standard of review to prove that appellee was harmed by appellant's fraud. *See Hall*, 168 S.W.3d at 170.

29

## Willful Commingling

In its first issue, appellant contends that the evidence is legally and factually insufficient to support the jury's finding that it willfully commingled oil that was produced from the D.D. Strange with oil from the Powell and Hoff. As part of this issue, appellant contends that Texas Railroad Commission reports purportedly relied on by appellee are not evidence of commingling, that there is insufficient evidence of any commingling between the D.D. Strange and the Powell, that there is insufficient evidence that if any commingling occurred, it happened while appellant operated the D.D. Strange, that there is insufficient evidence to identify oil that appeared in the Hoff saltwater disposal tank after Willowbend took over operation of the D.D. Strange as actually coming from the D.D. Strange, that there is insufficient evidence of willfulness, and that the evidence shows, at most, only an accidental malfunction of the separator float, the means by which appellee claims the oil from the D.D. Strange was commingled with oil from the Powell and Hoff.

### Applicable Law

Commingling is also referred to as confusion of goods; "[a]s a general rule, the confusion of goods theory attaches only when the commingled goods of different parties are so confused that the property of each cannot be distinguished." *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 818 (Tex.

30

1974); *see also* 12 TEX. JUR. 3D *Confusion of Goods* 902, 903 (2004). "One who wrongfully permits the property of another to become so intermingled and confused with his own property as to render it impossible to identify the goods of each is under the burden of disclosing such facts as will insure a fair division, and if he fails or refuses to do so, the combined property or its value will be awarded to the injured party." 12 TEX. JUR. 3D *Confusion of Goods* 902, 905-06 (2004) (citing *Humble Oil*, 508 S.W.2d at 818); *see Farrow v. Farrow*, 238 S.W.2d 255, 257 (Tex. Civ. App.—Austin 1951, no writ). In applying the commingling rule, we hold one who willfully commingles to a strict burden; however, the application of such a burden is not appropriate until "the facts establish that there has been a commingling." *Mooers v. Richardson Petroleum Co.*, 146 Tex. 174, 204 S.W.2d 606, 608 (Tex. 1947); *Cole v. Wadsworth*, 326 S.W.2d 928, 931 (Tex. Civ. App.—Eastland 1959, writ ref'd n.r.e.); *see also Dorchester Gas Producing Co. v. Harlow Corp.*, 743 S.W.2d 243, 256 (Tex. App.—Amarillo 1987, writ dism'd).

**Applicable Facts**

Appellee alleged two theories of commingling by appellant: first, that appellant had misreported production from the D.D. Strange to the Texas Railroad Commission; and second, that appellant intentionally mis-set or altered the setting of the float in the oil and water separator from the No. 2 well so

31

that oil and water produced from that well crossed lease lines and commingled with oil produced from the Powell and Hoff. As damages, appellee pled for her "pro rata share of all oil produced from" the Powell and Hoff. The trial court granted appellant's directed verdict as to the misreporting to the Railroad Commission, and appellee does not challenge that decision on appeal. Thus, we will review whether the evidence is sufficient to support a finding of willful commingling based on the separator setting.

Appellee testified that when she first went to inspect the D.D. Strange with Brock, she noticed that the screw that would have held the separator "lever" properly was not there. According to appellee, this inspection occurred sometime between March and May 2001 when Willowbend was operating the lease. She could not say whether the screw had been there when appellant was operating the lease.

According to Rusty, his son Doug, who owned a working interest in the Hoff, agreed in 1998 or 1999 to dispose of water pumped out of the D.D. Strange and Powell in the No. 1 well on the Hoff. Rusty also testified about the operation of a separator. According to Rusty, there is a float inside that floats in oil but not water. He agreed that the float is set on the line where the oil and water meet (the oil will float on the water because it is lighter). The separator also has a dump valve at the bottom; when the fluid gets to a certain level, the

32

"float will go down and will dump out your saltwater out of the bottom."  But if the float was sitting on the bottom of the separator, both oil and water would flow out.  Rusty agreed that there was a similar separator on the Powell and that there would be no legitimate reason to set the float so that it would sit at the bottom of the D.D. Strange or Powell separators.  Rusty agreed that his son, Robert, who oversaw daily operations on the D.D. Strange, would know how to set the float.[25]

Rusty testified that until 1999, appellant trucked the disposed water off of the D.D. Strange.  After Doug started disposing of the D.D. Strange's water on the Hoff, Rusty was not sure whether the water line from the D.D. Strange went to the Powell water tank first and then to the Hoff or whether the lines just "tied in together."  At some point, oil was found in the water tank on the Hoff; Rusty said it was probably from the Powell because of the decreased production on the D.D. Strange.

Brock testified that after appellant decreased production on the D.D. Strange, he began to "suspect[] things . . . weren't right on all the leases."  One of the things he noticed was that the separator was malfunctioning because "the float wasn't set on it.  The setscrew wasn't set on the float, and,

---

[25] Robert owns working interests in the Powell and Hoff but not the D.D. Strange.

therefore, it was on the bottom." The effect of the setting was that if any fluid came through—oil, water, or both—it would all go down into the waterline. According to Brock, the waterline from the D.D. Strange went to either the Hoff injection well or the Hoff water tank. Although Brock said that it was "possible they could separate [the water from the D.D. Strange] again over there on the Hoff lease," he also said that he had never told anyone that oil from the D.D. Strange separator was going to the Hoff water tank. Brock estimated that the separator was repaired within about a week after Willowbend took over the D.D. Strange operations, which was March 1, 2001.

Brock testified that there was no pin missing from the separator but that the setscrew was "all the way out." When asked whether he was aware of any evidence that the separator was not working perfectly when appellant was operating the D.D. Strange, Brock answered, "Not that I know of, no."

Brock testified that sometime before Brock & Strange started pumping the No. 2 well, he could hear fluid going through the flow line that went from the well tubing through the separator to the tank battery, but there "wasn't any gas or fluid or anything going into the tank battery or even the separator." According to Brock, he discovered a bypass buried underground that was causing fluid from the No. 2 well to go down the flow line for the No. 1 well instead of to the separator. Because the separator was set at sixty pounds of

34

pressure, the fluid couldn't overcome that pressure and instead it was forced down the flow line and through the bypass back into the casing for the No. 1 well. Brock agreed on cross-examination that he could not have run fluid into the storage tanks unless the separator was working and that if the separator was not working, it would be impossible to flow oil from the D.D. Strange into the tanks.

Although Brock seemed confused during much of his testimony about the exact date that the bypass and separator were discovered,[26] he did testify clearly that the two problems were discovered about two or three days apart.[27] He also never wavered from his testimony that the problem with the separator was discovered by Willowbend after it took over operating the D.D. Strange in March 2001 and that Willowbend was the one who showed him the separator problem.

---

[26] Brock admitted that he had guessed at "a lot of dates."

[27] Brock's testimony is quite conflicting as to when the bypass and separator were discovered. Although he testified several times that he found the bypass after Brock & Strange took over operations, he also testified that he found the separator malfunction after finding the bypass and was adamant that the separator malfunction was discovered by Willowbend while it was operating the lease. However, at one point Brock also testified that he found the bypass with Brock & Strange's pumper, Kinsey, before Brock & Strange took over operation of the lease; this testimony could have been relied upon by the jury to resolve the conflict with his other testimony. *See Wilson*, 168 S.W.3d at 827.

Rusty's son Doug testified by deposition.  Doug operates the Hoff.  Doug testified that before 2000, the water from the Strange was hauled off by tanker trucks.  But in 2000, Doug agreed that water from the D.D. Strange, Powell, Mullis, and maybe the Kinsey could be pumped to the Hoff saltwater disposal tank, where he then disposed of the water in one of the Hoff wells.  Doug admitted that at one time, his son had found "a couple or three feet" of oil in the Hoff saltwater disposal tank.  He could not remember when this oil was discovered, but he said, "There shouldn't be oil down there."  According to Doug, the oil was from Murchison's lease, either the Powell, Mullis, or Kinsey;[28] he did not know if "the D.D. Strange was going in there then or not."  When the oil was discovered, Doug told Murchison, "Hey, you-all got a problem over there.  You're sending a trickle stream of oil down to our tank with your water."  He further testified that the oil was struck by lightning and burnt "about two months ago."[29]

_____

[28] There is no evidence of the exact date of this discovery, but it must have been after March 2001 when Willowbend took over operations on appellant's former leases.

[29] There is no date for the deposition in the record, but because there is no indication that there was any presuit discovery, *see* TEX. R. CIV. P. 202, we presume that the deposition was taken after suit was filed.

Robert, Rusty's son and production supervisor for appellant's operations, also testified at length about the operation of a separator.  According to Robert, when the fluid enters the separator, the water falls to the bottom and the oil rises to the top.  A float is inside, which will float on the water, but sink in the oil; thus, the float should always be on the water line.  If there is no water in the separator, the float will always stay on the bottom.  When the water rises to a certain level, a handle on the float that is outside the separator activates a flip valve, which opens a valve that allows the water to come out.  As the water level lowers, the float lowers and the valve shuts off.  This way, the separator is able to continuously release water from the separator as it comes in.  There is another valve in the separator that works strictly off of pressure.  When oil builds up in the separator and the water has not reached the level where it will be released, pressure builds up, which in turn opens a different valve.  The pressure valve is spring-loaded and "lets pressure escape by a predetermined amount by the tension you put on the spring."  Oil is released from that valve and goes on to the tanks for storage.

According to Robert, pressure would not affect the separation of the oil and water except that there has to be enough pressure to dispose of the water. The longer the distance the water needs to travel, the higher the pressure needs to be in the separator.

37

Robert testified that he was the person in charge of making sure the separator on the D.D. Strange worked properly. According to Robert, the separator was functioning properly while appellant was operating the D.D. Strange. He also testified that initially, water from the lease went into a tank and was hauled off by truck. He said that the haulers never discovered oil in the water they collected, that they do not want oil in the water they collect, and that they "would know right away" if the disposal water had oil in it.

Robert testified that "[i]n . . . 2000 or somewhere" appellant stopped hauling water from the D.D. Strange and began disposing of it on the Hoff. The water from the D.D. Strange, the Powell, the Kinsey, and the Mullis leases was disposed of in one of the Hoff wells. All of the water lines from the leases met, in Robert's words,

> [u]p at the Powell tank battery, which is where the water tank was when we were trucking the water. We sat the water tank at the Powell because the other leases are down in a creek bottom. To make sure we could always get a truck in there to haul them, we set it at the Powell. And when we plumbed it in to go to the Hoff lease, everything was already – all the wells were already coming to that point, so we just disconnected the tank and tied them all together and laid the line from there to the Hoff injection well.

In other words, before 2000 or so, all the water from the Powell, Kinsey, and D.D. Strange went into the Powell water tank; the Mullis lease had another tank at its location. On cross-examination, Robert testified that "[t]he water from

38

the D. D. Strange went up to the *oil-saltwater* on the Powell and then went to the Hoff in 2000." [Emphasis added.] Thus, Robert agreed that from 2000 on, anything dumped out of the separator on the D.D. Strange would go to the Powell and then over to the Hoff. Robert further testified that if oil got into the water line, you would not be able to tell which lease it came from; you would have to check each lease's separator.

Robert testified on cross-examination that it was possible to set the float in such a way that the dump valve would always be open, then "water, oil, pressure, everything" would go out the dump valve and "straight into the water line," as if there were a hole in the separator.

Keith Masters, appellee's expert, testified that his calculation of commingling damages was based on above-ground mixing of the oil from the Powell, Hoff, and D.D. Strange. In other words, his damage calculation was based on the theory that oil actually produced from the D.D. Strange mixed with oil that was actually produced from both the Powell and the Hoff so that one could no longer tell which percentage of oil was produced from which lease.

Peyton Carnes, appellant's expert, also testified about the operation of a separator. There is a dump valve where the water goes out and a line where the oil goes out to the tank. The float has a rod attached to it, and the rod is

39

attached to the dump valve on the bottom of the separator. The float should be set so that it floats on the line where the oil and water meet. As the water level rises, the float rises, the rod lowers, and the dump valve opens. As the water level lowers, the float lowers, and the dump valve closes. So if the rod is properly affixed to the float and dump valve, when the float is at the bottom of the separator, the dump valve is closed rather than open.

On cross-examination, Carnes agreed with appellee's counsel that if the separator is working correctly, "it is virtually impossible to send oil down the water valve." To the question, "[I]f somebody is out there monkeying with this thing and has set it incorrectly, then you would have a situation where your water and your oil were going out the bottom of it, correct?", Carnes answered, "That's possible."

In closing argument, appellee's counsel urged the jury that the evidence of commingling came from the following: the separator setting and "the oil and the water from the Strange going to the Powell and the Hoff. . . . Doug Lindemann admits that there was a stream of oil coming from the Strange to the Powell and the Hoff." The jury charge asked, "Did the operator of the Strange Lease willfully commingle the oil production from the D.D. Strange, Powell, and Hoff?" to which the jury answered, "Yes." On appeal, appellee's support for its commingling claim is the evidence of overproduction of the

40

Hoff—as discussed in detail, *supra*, in our discussion of appellant's second issue on fraud—the separator setting, and the presence of oil in the Hoff saltwater tank.

**Analysis**

Appellee's evidence of overproduction of the Hoff, standing alone, is not sufficient to prove commingling. In light of appellee's evidence of underground drainage, which supports its fraud claim, overproduction of the Hoff could have been caused solely by the improper drainage. Thus, we must consider whether the overproduction evidence, taken together with the evidence regarding the separator setting, establishes willful commingling.

Appellee contends that the presence of oil in the Hoff saltwater tank shows commingling. But there is no evidence that the tank to which the D.D. Strange water (and oil, assuming the separator was mis-set) was pumped was a separator in which oil produced from the Hoff mingled with oil and water from the D.D. Strange and Powell; instead, all the evidence is that after 2000, the water from the D.D. Strange and Powell went to the Hoff water disposal tank, which then went back into the Hoff injection well. Because the waterlines from the D.D. Strange and Powell "tied in together" and then went to the Hoff, any fluid from the D.D. Strange and Powell, while perhaps mixed together in the connected waterline, would ultimately end up in the Hoff injection well. There

41

is no evidence that any of this fluid was actually "produced" and diverted to the Hoff storage tanks. Indeed, the conclusion that the water tank on the Hoff was a disposal tank only and not a separator is supported by Doug's testimony that there should not have been oil in that tank. One would expect oil to be in a separator but not a water disposal tank.

Thus, we are left with the evidence regarding the setting of the separator. There is evidence that before 2000, any fluid coming down the waterline from the D.D. Strange went, in Robert's words, to the "oil-saltwater" on the Powell. It is a reasonable inference from this testimony that fluid traveling down the waterline from the D.D. Strange, whether oil, water, or both, did not go merely to a disposal tank but to a separator, and that if any oil was in the D.D. Strange waterline, it was produced, and thus commingled, with the oil produced from the Powell. But Willowbend, Brock, and appellee discovered the separator mis-setting in spring 2001, after water was already being sent to the Hoff. There is no evidence as to how long the separator had been mis-set, whether the mis-setting was intentional, as appellee contends, or accidental, as appellant contends.[30]

---

[30] The evidence of the separator mis-setting is also consistent with the lease having been shut in completely for several months; Brock testified that when he first went to the D.D. Strange, it looked as if no one had been out there for awhile.

If the jury believed Brock's testimony that the bypass was discovered before the separator and that when the bypass was discovered, no oil could have even made it to the separator because it was all going back into the No. 1 well, then the fact that the separator was set so that its dump valve was continuously open would not matter because fluid would never reach the separator in the first place. To interpret Brock's testimony otherwise, that is, interpret it to mean that the separator mis-setting was discovered first, then the jury would have had to disbelieve his testimony about the bypass (because, again, even if the separator mis-setting was discovered first, if the bypass was functional as Brock said, no oil would have even made it to the separator).

Additionally, everyone agreed that if the float had been set so that the dump valve was continuously open, all oil would have gone down the waterline and none would have made it to the D.D. Strange tank battery for storage. Thus, the jury would have had to believe that either the production records for the D.D. Strange had been falsified (and the trial court's directed verdict on that issue has not been challenged) or that appellant hooked up the separator properly to pump one barrel per month into the D.D. Strange tank battery (or, for several years before October 2000, approximately one barrel per week), then intentionally mis-set the separator after pumping so that it could pump additional fluid through the separator and over to the Powell. This conclusion

43

would require too much speculation on the jury's part; there is no evidence that such continual alteration of the separator setting occurred.

Accordingly, we conclude and hold that the evidence is legally insufficient to sustain the jury's finding of wrongful commingling. We sustain appellant's first issue. In addition, because appellant also challenged the damages awarded as to commingling, we sustain its third issue challenging the damages awarded by the jury for wrongful commingling.

### Damages

In its fourth and fifth issues, appellant challenges the legal and factual sufficiency of the actual and exemplary damages awarded to appellee on her fraud claims.

Appellant challenges the damages not only on the ground that the jury's fraud finding was not supported by the evidence; it also challenges the evidence supporting the amount of damages awarded by the jury on the grounds that the expert who calculated the damage model did not testify that any fraud had occurred and that there is no evidence that Rusty's statement caused any particular harm to appellee.

Although, as appellant points out, Masters—appellee's expert who calculated damages based on the improper drainage of the D.D. Strange oil—did not testify that his damage calculations were based on a determination that

44

fraud had occurred, there is other evidence in the record supporting the conclusion that appellant committed fraud. And appellee's theory at trial was that Rusty made his false statement about the decrease in D.D. Strange production to facilitate the continued improper drainage; i.e., he did not want appellee and Brock to investigate further so that appellant (and his sons) could continue draining the reservoir without interference. Thus, the fact that Masters himself did not calculate the damages based on a conclusion of fraud is immaterial.

The jury has the discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation. *Duggan v. Marshall*, 7 S.W.3d 888, 893 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *Mayberry v. Tex. Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied). Here, the jury's award of $233,300 corresponds closely with Masters's damage calculations for drainage of the D.D. Strange oil from 1995 through February 2001. Although the evidence regarding the well being "shut in," i.e., not being productively pumped, tends to show that the shutting in did not occur until 1998 at the earliest, there is also evidence, via Rusty's deposition testimony, with which he was impeached, that appellant actually began cutting back on production in 1995. And as we have already determined, there is legally and factually sufficient evidence that

appellee's reliance on Rusty's statement on waiting for the water to hit facilitated appellant's drainage of the oil under the D.D. Strange. Accordingly, we conclude and hold that the jury's damage award is supported by sufficient evidence. We overrule appellant's fourth issue.

Appellant challenged the $200,000 exemplary damages awarded by the jury solely on the ground that there is no clear and convincing evidence that appellee was harmed by the fraud. We have already determined that the evidence supports such a conclusion; thus, we overrule appellant's fifth issue.

### Conclusion

Having overruled appellant's second, fourth, and fifth issues, we affirm the trial court's judgment as to the jury's findings on fraud and the actual and exemplary damages related to that claim. But having sustained appellant's first and third issues, we reverse the part of the judgment awarding appellee damages for willful commingling and render a take-nothing judgment as to that claim only.

TERRIE LIVINGSTON
JUSTICE

PANEL A:   CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DELIVERED: May 29, 2008

