

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-313-CV**

HYDE-WAY, INC. AND CHARLES               APPELLANTS
GLEN HYDE

V.

JOHN R. DAVIS               APPELLEE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellants Hyde-Way, Inc. (Hyde-Way) and Charles Glen Hyde (Hyde) appeal from the jury's verdict and the trial court's judgment awarding appellee John R. Davis various types of damages for his assault claim. In eight issues, appellants argue (among other contentions) that the trial court erred by

---

[1] *See* Tex. R. App. P. 47.4.

submitting portions of its charge to the jury and that there is no evidence to support the jury's answers to some of the questions in the charge. We affirm.

## Background Facts

Hyde-Way, a business that Hyde and his wife (Candace) incorporated as sole shareholders in 1980,[2] has operated a portion of the Northwest Regional Airport (the Airport)[3] since at least 1983. Hyde-Way constructed and owns hangars at the Airport, and it previously owned the Airport's runway. Hyde is the president of Hyde-Way and Candace is its secretary-treasurer.

Hyde and Candace live at the Airport in a hangar. Hyde has a history of blocking car and aircraft access to the Airport's taxiways.[4]

---

[2] At the time of the April 2008 trial, and for six to nine years preceding the trial, Candace owned all of Hyde-Way's stock. No one has ever owned Hyde-Way stock other than Hyde or Candace, and Hyde-Way has never had any full-time employees other than those two individuals.

[3] The Northwest Regional Airport is a small private airstrip that was previously owned by Hyde-Way and is now owned by Texas Air Classics. The Airport has several hangars for small aircraft and aircraft-related businesses. Texas Air Classics owns the runway, the main taxiway, and some land; Hyde is Texas Air Classics' director and Candace is its treasurer. The Hydes also own other various aviation-related corporations.

[4] Taxiways are paths that allow aircraft to travel between their hangars and the runway. Taxiways also act as streets for the Airport that cars can use. Hangar owners must pay fees to use taxiways. Texas Air Classics owns and controls the Airport's taxiways, and it receives the fees paid for the taxiways' use; however, some individuals make their taxiway payments to Hyde-Way.

Davis bought a hangar at the Airport in 1990 through a foreclosure sale; he intended to use it as a residence and also for a helicopter maintenance business. Davis also bought two 7,500-square-foot lots that adjoined the 6,000-square-foot hangar and a one-acre lot that was not adjacent to the hangar. He needed to use a taxiway to give his customers access to his hangar. Davis paid taxiway dues of $456 per year from 1990 to at least 1999.[5] On two occasions between 1990 and 1996, Hyde offered to sell the grass taxiway to Davis for one dollar if Davis paid to pave it.

Hyde and Davis eventually had a dispute about access to the taxiway; Hyde has not allowed any access from Davis's hangar to the taxiway since 2000. On April 7, 2004, stemming from their taxiway dispute, Hyde and Davis exchanged words while they were in their respective vehicles.[6]

A week later, on a Sunday evening, Hyde stopped his pickup truck in the middle of a narrowly paved road near the Airport and Davis's house, loudly

---

[5] Davis paid Hyde directly in 1990; he then paid annual checks to the Airport and then to the Airport owners' association, although he continued to deliver these checks to Hyde.

[6] The specific contents of the April 7, 2004 conversation are included below in our discussion of the jury's exemplary damages award. Before the April 7, 2004 encounter occurred, Hyde and Davis had not spoken since 1998.

3

exchanged angry words with Davis,[7] walked about twenty feet quickly toward Davis as Davis also moved toward him through a grassy area between the road and his house (located on the one-acre lot he had purchased), and punched Davis in his face two or three times as Davis tried to retreat.[8] Hyde returned to his truck and drove away; Davis, while holding a tooth in his hand and with his mouth bloodied from the encounter, walked to strangers in a car who had witnessed the assault and asked them to stay as he called the police. The driver of the car left but gave Davis his phone number, and the driver later gave a statement to law enforcement and testified in the trial of this case.

Davis then walked into his house, and his wife called 911. When Davis first spoke to the 911 responder, he said he did not need an ambulance because he was "trying to be tough." About fifteen minutes later, Davis called 911 again and asked for an ambulance.

---

[7] Hyde said to Davis, "You got something to say to me?" Davis responded, "Short of 'f--- you,' no."

[8] Davis said that when he said "f--- you" to Hyde, Hyde "just exploded. . . . And he jumped out of his truck, and he ran through the ditch. And he's got his fists up, and he's going, 'Come on, come on. Right here.' . . . And he sucker punched me with his left [fist]." Davis explained that the assault occurred inside Davis's fence line and that Hyde hopped like a boxer before he hit Davis's eye and then kicked him in the groin area. Davis also testified that it was common on Sunday evenings for Hyde to "patrol the [A]irport when he'd get done at his office."

As Davis waited for an ambulance, his wife took some pictures of his injuries.[9] The ambulance arrived, and then paramedics placed Davis on a stretcher and took him to a hospital in Grapevine. At the hospital, Davis received advice that he contact his dentist. Later that night, the hospital released him, and he gave a statement about Hyde's assault to the police.

Davis went to his dentist two days later and learned that two of his teeth had been fractured. The dentist made temporary crowns for aesthetic purposes, and then the dentist referred Davis to a periodontist (a dental specialist) to restore the teeth through a crown-lengthening procedure.[10] Davis had two or three more appointments with the dentist over the course of several months and three appointments with the periodontist for further work that took several hours to complete. Davis's appointments with his dentist cost over $3,400; his appointments with his periodontist cost approximately $800.[11]

In February 2003, Davis and his wife filed an original petition that contained assault and trespass claims and alleged that Hyde and Hyde-Way were both responsible to pay exemplary damages and economic and

---

[9] The court admitted these pictures as exhibits at trial.

[10] The crown-lengthening procedure involves removing gum tissue to expose teeth and then suturing gums back around the teeth.

[11] The trial court admitted copies of the bills and medical records related to Davis's hospital stay and his dental treatment.

5

noneconomic damages related to Davis's medical expenses, pain and suffering, loss of consortium, and lost wages.[12] That same year, through a realtor, Davis listed his three parcels of property near the Airport for sale. He sold the one-acre lot where his home was located, but he did not sell the other lots because, among other reasons, access to the taxiways, which were owned by Hyde's company, had been blocked by Hyde with several truckloads of trash, asphalt, and dirt,[13] meaning that there was no access to the taxiways except through an agreement with Hyde.[14] Davis's realtor placed signs on the property, but someone repeatedly destroyed or stole the signs, and Davis eventually chose to take the lots off of the market.

---

[12] Only Davis remained in the case at the time of the trial court's judgment because his wife nonsuited her claims on the day of trial. Thus, in the remainder of this opinion, we will refer only to Davis with regard to portions of the case in which he and his wife jointly filed documents.

[13] Davis testified that he stopped paying access fees for the taxiways once "the dirt appeared."

[14] Davis explained that his hangar and the two lots around it remained for sale, "but there's no point in trying to sell them. There's no way anyone will buy them." He also said that he once had an offer on the property, but after the potential buyer "went to see Mr. Hyde, . . . when he came back, he wanted out of the contract." He stated, "We've had two other serious inquiries to the point where they were going to sign a contract; but they spoke with Mr. Hyde first, and then they wouldn't." Davis asserts that Hyde wants to buy the property and that Hyde has taken actions to force Davis to sell the property to him for a low price. Davis said that his trouble with Hyde started when Davis refused to sell his property to Hyde.

In a related criminal trial, a jury convicted Hyde in March 2006 for the assault on Davis. In May 2006, Davis filed a traditional motion for partial summary judgment, contending that Hyde's criminal conviction for assault precluded his ability to prevail on that claim in Davis's case against him.[15] After Hyde did not respond to the motion, the trial court granted it (as against Hyde individually) and decreed that Hyde was liable for assaulting Davis.

The jury trial on the parties' remaining claims began in April 2008. At trial, during his opening statement to the jury, Davis's counsel related that the basis of Davis's case was that during Hyde's assault of Davis, Hyde was acting in furtherance of Hyde-Way; he also contended that Hyde and Candace are "professionals . . . at the corporate shell game." Hyde-Way's counsel asserted that Davis was a "liar" and a "perpetrator of a fraud" who "phonied up a deal" to get money.

Davis testified that he had not incurred any damages since the time of Hyde's criminal trial. He also testified that he could not recall why he sued Hyde-Way; he stated, "that's something [Davis's attorneys] decided after we

---

[15] As summary judgment evidence, Davis included a copy of the verdict from Hyde's criminal case and a copy of our opinion affirming Hyde's conviction. *See Hyde v. State*, No. 02-04-00349-CR, 2005 WL 1838980, at *3 (Tex. App.—Fort Worth Aug. 4, 2005, no pet.) (not designated for publication).

7

told them what had happened." When asked what Hyde-Way does, Davis responded that he "believe[d] they're in the real estate business" and that such information is "[s]ecretive between all [Hyde's] corporations." He reiterated his belief, however, that when Hyde assaulted him, he was on Airport patrol because "[e]verything that happens on the [A]irport happens through Glen Hyde," although he admitted that his belief was speculative.

Candace testified that although Texas Air Classics collects licensing fees for use of the Airport's taxiways, Hyde-Way is the enforcer of the fees. And she admitted that she typed a letter to law enforcement about Hyde's assault of Davis that is signed by Hyde in his capacity as president of Hyde-Way and that is printed on Hyde-Way letterhead. The letter, dated December 12, 2002, states,

> Dear Sheriff Lucas,
>
> On November 14, 2002, at approximately 3:30 P.M., [Davis] trespassed on my property. I have advised [Davis] to stay off my [A]irport property on numerous occasions, but he continues to trespass, as well as antagonize, use profanity, hand signals, etc. [Davis] has a long[-]standing history (over eight years) of this type of conduct witnessed by numerous people.
>
> Last April 14th, [Davis] assaulted me while I was in my vehicle on a Denton County Road that runs in front of his house. In order to defend myself, I exited the truck and a fist fight ensued in which [Davis] received a couple of smacks to the head and a swift kick to his posterior. After waiting two weeks, [Davis] elected to file a complaint with [law enforcement]. . . .

8

This whole matter took place in the middle of a county road. I never went onto [Davis's] property, which clearly proves [Davis] assaulted me. . . . If the Sheriff's Department ever wants to arrest me, all they have to do is come by my office 9 A.M.-5 P.M., Monday-Friday at Northwest Regional Airport, where I've worked and resided for over twenty years! However, in consideration of [Davis's] and my long[-]standing personality differences[,] I feel it's in our mutual benefit and best interest if [Davis] doesn't come anywhere on my [A]irport property. Please advise [Davis] not to come on my property as soon as possible. I've enclosed an [A]irport map showing [Davis's] property and the [A]irport property. . . . [O]ur office can't find any written license agreement authorizing [Davis] or [his] tenants or guests access to Northwest Regional Airport. . . .

. . . .

Sincerely,

[][16]

Glen Hyde, President

Candace said that it has been "years" since Hyde-Way has paid her or Hyde any salary. When asked whether Hyde-Way did business in 2002, she responded, "Not really," but this conflicts with her testimony that Hyde-Way had a part-time employee in that same year. She testified that Hyde was not working for Hyde-Way on the night of the assault. Finally, she stated that (as asserted in Hyde-Way's letter to law enforcement) Davis has trespassed on her property and that Davis is aggressive and a "very scary fellow."

---

[16] Hyde signed his name here.

9

After Davis rested his case, Hyde-Way moved for a directed verdict on Davis's whole case against it, and Hyde moved for a directed verdict on Davis's request for exemplary damages; the trial court denied both motions. Neither Hyde nor Hyde-Way called any witnesses.

At the jury charge conference, all parties requested various additions or made objections. The parties presented their closing arguments, and then the jury deliberated and returned its verdict for Davis's assault claim.[17] Appellants jointly filed a motion for judgment notwithstanding the verdict or for a new trial, contending that there is no evidence to support several of the jury's answers; following a hearing, the court denied these motions.

In its judgment, based on the jury's verdict, the trial court assessed the amount of damages plus prejudgment interest at $156,918.72, and it also assessed postjudgment interest until that amount is paid. Appellants filed this appeal, asking us to reverse the trial court's judgment and render a take-nothing judgment.

## Hyde-Way's Liability for Hyde's Assault

In their first four of eight issues, appellants assert that Hyde-Way should not be liable for Hyde's assault because there is no evidence to support three

---

[17] The jury found against Davis on his trespass claim; it determined that the assault did not occur on Davis's property.

10

of the jury's answers and because the trial court erred by refusing to include a requested definition in the jury charge. Specifically, they argue that the trial court erred by not including in the definition of "employee" the phrase "and who is compensated for his services" and that there is no evidence to support the jury's affirmative responses to (1) question number one, which asked, "Is [Hyde-Way] responsible for the conduct of [Hyde]?"; (2) question number two, which asked, "On the occasion in question[,] was [Hyde] acting as an employee of [Hyde-Way]?"; and (3) question number three, which asked, "On the occasion in question[,] was [Hyde] acting in the scope of his employment?" Appellants do not challenge the factual sufficiency of the evidence, and they do not challenge the wording of the jury questions except for the definition of "employee," as described above.

**Standard of review**

A challenge that there is no evidence to support a jury's finding is a challenge to the legal sufficiency of the evidence. *See Exxon Corp. v. Emerald Oil & Gas Co.*, No. 05-1076, 2009 WL 795668, at *6 (Tex. Mar. 27, 2009); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners*, 237 S.W.3d 379, 389 n.9 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Hyde-Way and Hyde acknowledge that they are challenging the legal sufficiency of the evidence to support the jury's findings.

11

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); *W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 774 (Tex. App.—Fort Worth 2008, pet. denied).

In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the

existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

**Issue one, concerning jury question number one**

In the first question of the jury charge, the trial court asked the jury, "Is [Hyde-Way] responsible for the conduct of [Hyde]?" The court then instructed the jury that Hyde-Way is responsible for Hyde's conduct if it was

> organized and operated as a mere tool or business conduit of [Hyde] and there was such unity between [Hyde-Way and Hyde] that the separateness of [Hyde-Way] had ceased and holding only [Hyde] responsible would result in injustice.
>
> In deciding whether there was such unity . . ., you are to consider the total dealings of [Hyde-Way and Hyde], including:
>
> 1. the degree to which [Hyde-Way's] property had been kept separate from that of [Hyde];
>
> 2. the amount of financial interest, ownership, and control [Hyde] maintained over [Hyde-Way];
>
> 3. whether [Hyde-Way] had been used for personal purposes of [Hyde]; and,
>
> 4. [Hyde] used [Hyde-Way] as a means of evading an existing legal obligation, and holding only [Hyde] responsible would result in injustice.

The "business conduit" and "unity" terms and the four factors described in the jury charge relate to the "alter ego" theory of piercing the corporate veil to justify holding the shareholders of a corporation liable for a corporation's

13

acts. *See Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)*, superseded by statute as stated in Willis v. Donnelly*, 199 S.W.3d 262, 271–72 & n.12 (Tex. 2006); *Seidler v. Morgan*, 277 S.W.3d 549, 557 (Tex. App.—Texarkana 2009, pet. denied); *Schlueter v. Carey*, 112 S.W.3d 164, 169 (Tex. App.—Fort Worth 2003, pet. denied). The trial court inversely used the factors to allow the jury to hold a *corporation* (Hyde-Way) liable for an *individual's* (Hyde's) actions. Although this portion of the jury charge may therefore be defective, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.), *cert. denied*, 530 U.S. 1244 (2000); *see City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000); *Kroger Co. v. Brown*, 267 S.W.3d 320, 323 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Thus, we must use the charge's language and its factors to determine Hyde-Way's liability, even if the language and the factors would not otherwise be relevant to that determination.

For similar reasons, we cannot consider the effect of section 21.223 of the business organizations code, which appellants cite as their principal support in arguing that the "alter ego" theory that is described in question number one

14

has been negated by the legislature.[18]  *See* Tex. Bus. Orgs. Code Ann. §
21.223 (Vernon 2008).  Neither Hyde-Way nor Hyde raised section 21.223 in
the trial court or argued in that court that question number one had been
improperly submitted for any reason other than that there was no evidence to
support it.  Thus, even if that section does negate the alter ego theory as
submitted in question number one, we must still measure the sufficiency of the
evidence under the standards submitted in that question.  *See Osterberg*, 12
S.W.3d at 55.

Almost all of appellants' first issue focuses on section 21.223; they only
briefly contend that there is "simply no evidence to support the jury's answer
to Question No. 1 that [Hyde-Way] was responsible for the conduct of Hyde."
They do not provide any analysis of the record in the briefing on their first
issue, and they do not cite any legal authorities that are unrelated to their
contention regarding section 21.223, but we must still address the legal
sufficiency of the evidence supporting question number one.  *See City of
Arlington v. State Farm Lloyds*, 145 S.W.3d 165, 167–68 (Tex. 2004).

We believe that there was at least more than a scintilla of evidence
presented at trial from which the jury could decide that Hyde and Hyde-Way

---

[18] In appellants' brief, they argue that "the jury [was] given instructions
which under [section 21.223] are prohibited."

15

were so unified in the events related to the assault that their separate identities ceased and that holding only Hyde responsible would be unjust. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334. As described, Hyde mixed and equated his dispute with Davis (which he now claims to be only personal) and his then-pending personal criminal prosecution with his Hyde-Way business operations by signing a letter on Hyde-Way's letterhead, as its president, detailing his version of the assault (which was belied by the evidence at trial). In that letter, Hyde said that he could be arrested at his office, where he had "worked and resided for over twenty years[.]" He further entangled his dispute with Davis with Hyde-Way's business in the letter by asking the sheriff to advise Davis "not to come on [his Airport] property as soon as possible," by stating that his office could not find any document authorizing Davis to be there, and by expressing his feeling that it was urgent that the sheriff's office "support this request for legal separation and restraint."

Next, as is described in more detail below, Hyde's words to Davis a week before the assault, when he talked about the taxiway issue and stated that he was going to run Davis off of the Airport, further connected Hyde-Way's functions to Hyde's personal dispute with Davis. Hyde's personal life and his business ventures also merge because he lives in a hangar at the Airport.

16

Furthermore, the record reflects Hyde-Way's loose structure, which creates difficulties in separating Hyde-Way's actions from Hyde's actions. In its more than twenty-eight years of existence, Hyde-Way has never been owned by anyone other than Hyde or Candace; the corporation has also never had any other officers or directors. When asked whether Hyde-Way has a vice-president, Candace testified, "No, sir. Or if we do, then it would probably just fall to me." And although Candace is Hyde-Way's sole shareholder, she expressed unfamiliarity with the process of the corporation's shareholder meetings, stating, "I think you have to have like shareholders elect directors and all that kind of stuff. And [Hyde], being one of the directors, I think, has to be there." She expressed similar unfamiliarity with how Hyde-Way would pay salaries.

Although the evidence related that Hyde does not own Hyde-Way stock anymore because Candace owns it all,[19] there was no testimony indicating that Hyde does not indirectly financially benefit from Candace's ownership of the stock or from the money the corporation makes. And the jury could have inferred that Hyde's finances were tied to Hyde-Way's finances because they

---

[19] It is unclear whether Hyde's transfer of his Hyde-Way stock shares to Candace occurred before or after the assault. The trial occurred in April 2008, the assault occurred in April 2002, and Candace testified that the transfer occurred "[m]aybe six, seven, eight, nine years ago."

17

heard admissions demonstrating that both Hyde's and Hyde-Way's net worth is "in excess of $600,000." *See City of Keller*, 168 S.W.3d at 821–22 (explaining that a jury may draw inferences from the evidence).

Also, as president, Hyde clearly had control over Hyde-Way's activities, as is admitted by Hyde-Way in its brief. Davis expressed his belief that Hyde controls Hyde-Way, testifying without objection, "All the corporations are Glen Hyde. There's no difference in any of them." The idea that Hyde's various corporations exist as an extension of each other and himself has some support in the record. For instance, Hyde or Candace own a corporation called Dream Ships that exists only to own an airplane that it purchased through a note from the Hydes. Also, Hyde-Way and Texas Air Classics share the same office space, phone number, and address.

We conclude and hold that the collective evidence presented at trial, viewed in the light most favorable to the verdict, would enable a reasonable jury to at least form differing conclusions about the answer to question number one, that the evidence was more than a scintilla in that regard, and that it was therefore legally sufficient to support the jury's answer.[20] *See Rocor Int'l, Inc.*,

---

[20] We acknowledge that the evidence, while legally sufficient, may not have preponderated toward holding Hyde-Way liable for Hyde's assault under the theory in question number one, as there was no evidence that Hyde used Hyde-Way to avoid obligations or that he commingled his own property with

18

77 S.W.3d at 262; *Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334; *see also Dominguez v. Payne*, 112 S.W.3d 866, 870 (Tex. App.—Corpus Christi 2003, no pet.) (explaining that in determining questions based on the alter ego theory, courts should take "a flexible fact-specific approach"). Thus, we overrule appellants' first issue.

**Issues two through four, concerning jury question numbers two and three**

Appellants' second through fourth issues concern question numbers two and three of the jury charge, which combined to give the jury an alternate way of holding Hyde-Way responsible for Hyde's assault if the jury answered "no" to question number one of the charge. Because we have held that Hyde-Way's liability is sufficiently supported by the evidence related to question number one of the charge, which directly asked if Hyde-Way should be responsible for Hyde's conduct, we will not address whether its liability is supported by the alternate theories outlined in question numbers two and three of the charge. *See* Tex. R. App. P. 47.1; *Hawkins v. Walker*, 233 S.W.3d 380, 395 n.47 (Tex. App.—Fort Worth 2007, pet. denied). Thus, we overrule appellants' second through fourth issues.

---

Hyde-Way's property. However, neither Hyde-Way nor Hyde has raised factual sufficiency as a ground for reversal.

19

**The Jury's Findings on Damages**

In their fifth through seventh issues, appellants challenge various aspects of the jury's findings on damages that are contained in question numbers six through eight of the jury charge. Question number six of the charge, which corresponds to appellants' fifth issue, asked the jury, "What sum of money, if paid now in cash, would fairly and reasonably compensate [Davis] for his injuries, if any, that resulted from the occurrence in question?" It then asked them to give an amount for six different types of damages:

- past physical pain and mental anguish (the jury answered $30,000);

- future physical pain and mental anguish (the jury answered $0);

- past loss of earning capacity (the jury answered $3,100);

- future loss of earning capacity (the jury answered $5,406);

- past medical care expenses (the jury answered $6,764.90); and

- future medical care expenses (the jury answered $10,000).

Appellants contend that there is no evidence to support the damages for past physical pain and mental anguish, past loss of earning capacity, future loss of earning capacity, and future medical expenses. They also assert that Davis's petition does not support damages for future loss of earning capacity or for

20

future medical expenses and that Davis's recovery for past medical expenses in this case is barred by the doctrine of collateral estoppel and the one satisfaction rule because Hyde compensated Davis for his medical expenses as part of Hyde's criminal case. Appellants do not claim that the damages, although supportable in part, are merely excessive or that they are not supported by factually sufficient evidence.

**Standard of review**

We apply the same no-evidence standard of review to legal sufficiency challenges to the evidence supporting a jury's damage awards as we do to a legal sufficiency challenge on a jury's liability findings. *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 549 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g).

**Issue five, concerning jury question number six (on the components of economic and noneconomic damages)**

**Past physical pain and mental anguish**

Appellants in one paragraph argue that Davis "literally offered no testimony whatsoever as to the dollar value of the physical pain and mental anguish he had sustained prior to trial" and that because Davis had existing root canals before the assault, there were no exposed nerves when Hyde broke

21

Davis's teeth. Appellants do not assert that Davis did not have mental anguish

after the assault. As we have explained,

> The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. The presence or absence of pain, either physical or mental, is an inherently subjective question. No objective measures exist for analyzing pain and suffering damages. Once the existence of some pain and suffering has been established, however, there is no objective way to measure the adequacy of the amount awarded as compensation.

*HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth

2005, no pet.) (citations omitted). Thus, because personal injury damages are

"unliquidated and incapable of measurement by any certain standard, the jury

has broad discretion in fixing the amount of the award." *Marvelli v. Alston*,

100 S.W.3d 460, 482 (Tex. App.—Fort Worth 2003, pet. denied). Matters of

"past and future physical pain, mental anguish, and physical impairment are

particularly within the jury's province. Therefore, as long as sufficient probative

evidence exists to support the jury's verdict, neither the reviewing court nor the

trial court is entitled to substitute its judgment for that of the jury." *Id.* (citation

omitted); *see J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 665–66 (Tex.

App.—Fort Worth 1999, pet. denied). A plaintiff is not required to testify about

a specific amount of damages in order to obtain a verdict for physical pain and

22

mental anguish.[21] *See Baylor Med. Plaza Servs. Corp. v. Kidd*, 834 S.W.2d 69, 78 (Tex. App.—Texarkana 1992, writ denied); *see also Sw. Tex. Coors, Inc. v. Morales*, 948 S.W.2d 948, 952 (Tex. App.—San Antonio 1997, no writ) (explaining that pain and suffering are "not subject to precise mathematical calculations").

Although appellants are correct that there were no exposed nerves when Hyde broke Davis's teeth, the record contains significant testimony and photographic evidence that substantiates Davis's physical pain. For instance, Davis received a black eye from Hyde's punch to his face, and he testified that he hurt "like hell" as soon as he was punched; he had broken blood vessels; the hospital gave him a prescription for a "Vicodin-type pain reliever"; when at the dentist and periodontist, he was "sore" and "uncomfortable"; and for a few days after Hyde punched him, he could not chew food.

Thus, we cannot agree with appellants' implication that Davis did not suffer from any pain. Because there is more than a scintilla of evidence to support the jury's award for Davis's past pain and suffering, we overrule that

---

[21] Appellants do not cite any authority that would require Davis to have testified to a specific dollar amount of pain and mental anguish damages. We note that Davis did not specify any amount of damages in his petition, and appellants did not file special exceptions to his petition.

portion of appellants' fifth issue. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334.

**Past loss of earning capacity**

Next, appellants contend that there is no evidence to support the jury's award to Davis for his past loss of earning capacity and that Davis did not plead any claim in his petition for that award. Davis asked for recovery for "lost wages" in his petition. The jury's verdict awarded $3,100 for "loss of earning capacity," but the trial court's judgment awarded that same amount for "past lost wages." Appellants acknowledge that Davis pleaded a claim for "lost wages," but they seem to argue (in one sentence and without citing any authority) that "earning capacity" must be treated differently than "wages."[22]

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific

---

[22] Some Texas courts have equated the loss of past earning capacity to the loss of wages and have used these terms interchangeably. *See McIver v. Gloria*, 140 Tex. 566, 569, 169 S.W.2d 710, 712 (1943) (signaling that the loss of wages is a component of the loss of earning capacity); *Bowler v. Metro. Transit Auth. of Harris County*, No. 01-06-00553-CV, 2007 WL 1299803, at *3 (Tex. App.—Houston [1st Dist.] May 3, 2007, no pet.) (mem. op.) (equating lost wages to lost earning capacity); *City of San Antonio v. Vela*, 762 S.W.2d 314, 320 (Tex. App.—San Antonio 1988, writ denied) (holding that testimony regarding lost wages supported an award for lost earning capacity); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(10) (Vernon 2008) (including "wages" as a component of "loss of earnings").

24

grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must get a ruling from the trial court. This ruling can be either express or implied. *Frazier v. Yu*, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied).

To the extent that appellants contend that the judgment is defective because it awards money for lost wages while the jury's verdict awards money for loss of earning capacity, appellants have not preserved that contention because they did not file any motion to amend or modify the judgment, did not address that alleged error in their motion for new trial (which was filed before the judgment was signed), and did not otherwise raise the issue in the trial court. *See* Tex. R. App. P. 33.1(a); *Luna v. S. Pac. Transp. Co.*, 724 S.W.2d 383, 384 (Tex. 1987) (holding that a challenge on appeal to the apportionment of damages in a judgment was waived by failing to object to the judgment in the trial court); *Dal-Chrome Co. v. Brenntag Sw., Inc.*, 183 S.W.3d 133, 145 (Tex. App.—Dallas 2006, no pet.); *see also Karenev v. Kareneva*, No. 02-06-00269-CV, 2008 WL 755285, at *7 (Tex. App.—Fort Worth Mar. 20, 2008, no pet.) (mem. op.) (holding that the appellant waived any error about the characterization of child support awards by failing to file a post-judgment

motion such as a motion for new trial or a motion to amend or correct the judgment). And to the extent that appellants argue that a question regarding "loss of earning capacity" should not have been submitted to the jury because Davis did not plead for such damages, they waived that argument by failing to object to the jury charge on that ground at trial. *See* Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 274 (explaining that any complaint as to a jury charge question based on "fault in pleading" is waived unless specifically objected to); *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007); *see also McFarland v. Sanders*, 932 S.W.2d 640, 647 (Tex. App.—Tyler 1996, no writ) (holding that error regarding the failure of the jury charge to conform to the pleadings was waived by the appellant's failure to object).

Finally, the record belies appellants' complaint that Davis "introduced no evidence whatsoever as to his lost wages in 2002." Davis testified that his dental treatment caused him to take ten days' vacation from work, which cost him "a little over $3,000." The jury awarded him $3,100; Davis's testimony provides more than a scintilla of evidence to support this award. *Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334. For all of these reasons, we overrule the past-loss-of-earning-capacity portion of appellants' fifth issue.

26

**Future loss of earning capacity**

Appellants also assert that the jury charge's question on future loss of earning capacity is not supported by Davis's petition. But again, appellants did not raise an objection to the question on that basis at trial, so they waived any related error. *See* Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 274; *Equistar Chems., L.P.*, 240 S.W.3d at 868.

Appellants also argue that there is "absolutely no evidence whatsoever that [Davis] would sustain any 'loss of earning capacity' in the future." However, loss of future earning capacity specifically includes the loss of future wages or income. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(10)(A). Proof of future loss of earning capacity is uncertain and must be left largely to the discretion of the jury. *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 435 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Davis's dentist testified that the treatment Davis received is usually not a permanent fix and that future treatment involving extractions or implants will likely be required by both a dentist and periodontist. The jury could have reasonably inferred that Davis will be forced to miss at least some more time from work to attend and recover from additional medical procedures that are necessary because of Hyde's assault. *See City of Keller*, 168 S.W.3d at 821–22; *Lubbock County v. Strube*, 953 S.W.2d 847, 856 (Tex. App.—Austin

27

1997, pet. denied) (op. on reh'g) (holding that loss of earning capacity could be inferred from the evidence); *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 493–94 (Tex. App.—Houston [14th Dist.] 1989, no writ) (holding that missed work in the future for further treatment to an injury was compensable as a loss of earning capacity); *Mikell v. La Beth*, 344 S.W.2d 702, 707 (Tex. Civ. App.—Houston 1961, writ ref'd n.r.e.) (allowing recovery for time charged against sick leave as damages for loss of earning capacity). Appellants have not challenged the specific sum awarded for loss of future earning capacity by contending that the jury unreasonably inferred that Davis will be absent from work for more time that the procedures will actually require; their sole challenge is that there is no evidence at all to support any of the sum awarded. Thus, we also overrule the future earning capacity portion of appellants' fifth issue.

**Past medical expenses**

Appellants next assert that the jury's $6,764.90 award for past medical expenses is barred by the one satisfaction rule and collateral estoppel because Hyde compensated Davis for his medical expenses through restitution in Hyde's criminal case. The record indicates that as part of its judgment, the trial court in Hyde's criminal case ordered Hyde to pay Davis restitution in the amount of $2,772.90. Hyde paid the full amount. Davis argues that appellants cannot

28

prevail on this issue because they did not plead or prove the payment of restitution as an affirmative defense.

We agree with Davis that appellants' claim of restitution as a credit against the judgment is an affirmative defense that appellants were required to plead in the trial court. *See* Tex. R. Civ. P. 94, 95; *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 443–44 (Tex. 1993) (holding that indirect payment to a plaintiff as a credit against recovery is an affirmative defense under rule of civil procedure 95); *F-Star Socorro, L.P. v. City of El Paso*, 281 S.W.3d 103, 107 (Tex. App.—El Paso 2008, no pet.) (explaining that payment and offset through payment are affirmative defenses); *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied) (holding that offset to past medical expenses is an affirmative defense). Texas courts have specifically characterized the one satisfaction rule and the collateral estoppel doctrine as affirmative defenses. *See RenewData Corp. v. eMag Solutions, LLC*, No. 03-05-00509-CV, 2009 WL 1255583, at *1 n.1 (Tex. App.—Austin May 6, 2009, pet. filed) (mem. op.); *Domel v. City of Georgetown*, 6 S.W.3d 349, 353 (Tex. App.—Austin 1999, pet. denied). A defendant must plead an affirmative defense in its answer, or it will waive the defense. *See Bush*, 122 S.W.3d at 862; *Sugar Land Props., Inc. v. Becnel*, 26 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2000, no

29

pet.) (holding that under rule 95, the defendant waived its affirmative defense to reduce a verdict because of payment of medical expenses because it did not plead payment in its answer).

Appellants' combined two-page answer at trial asserted only a general denial; it did not assert any affirmative defenses. When appellants introduced evidence regarding Hyde's payment of restitution, the trial court granted Davis a running objection on the basis that Hyde did not plead payment of the restitution. Appellants did not seek any trial amendment to plead payment of the restitution. Under these circumstances, considering the authority cited above, we hold that appellants waived their defenses related to that payment. Thus, we overrule the challenge in their fifth issue to the jury's award of past medical expenses.

**Future medical expenses**

In the last part of their fifth issue, appellants challenge the jury's $10,000 award for future medical expenses. They argue that Davis did not plead recovery for his future medical expenses and that there is no evidence "as to the nature and extent of [Davis's] future medical care expenses in reasonable medical probability." Appellants did not object at trial to submission of the future medical expenses question on the basis that Davis did not plead for the expenses, so they have waived any error associated with that contention. *See*

30

Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 274; *Equistar Chems., L.P.*, 240 S.W.3d at 868.

To recover for future medical expenses under Texas law, the plaintiff must show that there is a "reasonable probability" (not a "reasonable *medical* probability") that such expenses will be incurred. *Bush*, 122 S.W.3d at 862–63; *Furr's, Inc. v. Logan*, 893 S.W.2d 187, 194 (Tex. App.—El Paso 1995, no writ) (explaining that the jury may make its award "based upon the nature of plaintiff's injuries, medical care rendered before trial, and the plaintiff's condition at the time of trial"). An award of future medical expenses lies largely within the jury's discretion, and no precise evidence is required to support such an award. *Bush*, 122 S.W.3d at 863; *see also Ibrahim v. Young*, 253 S.W.3d 790, 808–09 (Tex. App.—Eastland 2008, pet. denied) ("To sustain an award of future medical expenses, the claimant must present evidence to establish that, in all reasonable probability, future medical care will be required and to establish the reasonable cost of that care."). Also, because future medical expenses "are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages." *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied).

Here, after appellants stipulated that Davis's dentist was qualified to testify, the dentist explained that the treatment that Davis had received was

31

not usually a permanent fix. Instead, the dentist testified that the treatment Davis had received can be effective anywhere from five to fifteen years (depending on the age of the patient and the patient's hygiene), and then the teeth must be extracted so that an oral surgeon or dentist may place an implant or fixed bridge. The dentist explained that if the implants are done, the procedure would cost "4,000 to 5,000 per tooth," and he said that Davis would require the procedure for two teeth. We hold that, under the standards discussed above, this testimony comprised more than a scintilla of evidence to support the jury's $10,000 award for future medical expenses. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334. Thus, we overrule the final portion of appellants' fifth issue.

**Issues six and seven, concerning jury question numbers seven and eight (on exemplary damages)**

In their sixth and seventh issues, appellants contest the jury's $92,000 exemplary damage award. They contend in their sixth issue that the evidence is legally insufficient to establish that Hyde acted with malice while assaulting Davis, and they assert in their seventh issue that Davis did not present any evidence about a sum of money that is appropriate for exemplary damages.

32

**Malice**

Question number seven of the jury charge asked, "Do you find by clear and convincing evidence that the injuries caused by [Hyde] resulted from malice by Hyde?" *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(2) (Vernon 2008). The trial court instructed the jury of the definitions of "clear and convincing" and "malice":

> "Clear and convincing" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.

> "Malice" means:

> (A) a specific intent by [Hyde] to cause substantial injury to [Davis]; or

> (B) an act or omission by [Hyde]:

>> (1) which when viewed objectively from the standpoint of [Hyde] at the time of its occurrence involves an extreme degree of risk, concerning the probability and magnitude of the potential harm to others; and

>> (2) of which [Hyde] has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

33

*See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2), (7).[23] Appellants contend in their legal sufficiency challenge that Hyde's assault was a "childish temper act where Hyde just exploded and nothing more."[24]

In reviewing the evidence under a clear and convincing standard for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248–49, (Tex. 2008). We must review all the evidence in the light most favorable to the finding. *Id.* at 248.

Exemplary damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994) (op. on reh'g). Thus, the fact that an act is wrong or unlawful is not of itself a ground for an award of exemplary damages. *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 454. In determining the reprehensibility of a defendant's actions for the purpose of judging an award of exemplary damages, we consider whether the harm caused

---

[23] The portion of the "malice" definition in subsection (B) of the charge relates to the statutory standard used before the legislature amended section 41.001(7) in 2003, after this lawsuit was filed, to delete that subsection. *See BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 509 & n.6 (Tex. 2008).

[24] Appellants do not cite any legal authority in their discussion about the jury's malice finding.

was physical as opposed to economic, whether the conduct indicates an indifference to or a reckless disregard for the health or safety of others, whether the target of the conduct had financial vulnerability, whether the conduct involved repeated actions or was an isolated incident, and whether the harm was the result of intentional conduct or was a mere accident. *Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 272 (Tex. App.—Fort Worth 2004, no pet.).

The clear and convincing evidence of malice may be circumstantial. *See Nast v. State Farm Fire & Cas. Co.*, 82 S.W.3d 114, 125 (Tex. App.—San Antonio 2002, no pet.). As the Texarkana Court of Appeals has explained,

> Malice requires that the defendant's conduct involved an objective extreme risk of harm and that the defendant had a subjective "actual awareness" of an extreme risk created by the conduct. An objective extreme degree of risk is a risk "which is not a remote possibility of injury or even a probability of minor harm, but rather the likelihood of serious injury to the plaintiff." A subjective "actual awareness" requires evidence that the defendant knew about the peril, but its acts or omissions demonstrated it did not care.

*Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 447 (Tex. App.—Texarkana 2006, no pet.) (citations omitted). The harm to be anticipated from the conduct must be extraordinary harm such as death, grievous physical injury, or financial ruin. *Id.*

Ill-will, evil motive, or spite between the plaintiff and the defendant may be relevant as to whether the defendant acted with malice. *See ONI, Inc. v.*

35

*Swift*, 990 S.W.2d 500, 503 (Tex. App.—Austin 1999, no pet.); *Mo. Pac. R. Co. v. Lemon*, 861 S.W.2d 501, 517 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd) (op. on reh'g).  The criminal nature of the defendant's act may also be considered.  *See C & D Robotics, Inc. v. Mann*, 47 S.W.3d 194, 201 (Tex. App.—Texarkana 2001, no pet.).

"Substantial" injury is not defined by the exemplary damages statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001.  However, the Texas Supreme Court (in a case not related to exemplary damages) recently noted that the word "substantial" "has two basic components:  real vs. merely perceived, and significant vs. trivial.  These limitations leave a broad range of things covered." *Barr v. City of Sinton*, No. 06-0074, 2009 WL 1712798, at *9 (Tex. June 19, 2009); *see also In re C.M.C.*, 192 S.W.3d 866, 872 (Tex. App.—Texarkana 2006, no pet.) (defining "substantial" as "of ample or considerable amount, quantity, size, etc.").

The facts surrounding Hyde's assault on Davis reveal his ill-will and spite toward Davis.  For instance, a week before the assault occurred, Hyde flagged Davis down in front of Davis's house to initiate a conversation in which, after first exchanging some other words with Davis, Hyde said, "I'm sick of you.  I'm sick of that taxiway.  I'm going to take everything you've got.  I'm going to run your ass off the airport.  And when I'm done with you, your wife's going to be

36

giving blow jobs to n----- on Rosedale." And immediately after the assault occurred, Hyde said, "The next time I see you, I'm going to kill you." Finally, appellants admit in their brief that Hyde and Davis had ill-will toward each other; they state that the assault "is the culmination of approximately three to four years when [Davis] and Hyde would not speak to one another."

Hyde's act was obviously intentional and criminal in nature; he was convicted for the assault.[25] Appellants did not present any evidence at trial to attempt to justify Hyde's act; instead, the witnesses testified that Davis was trying to retreat when Hyde punched him. Also, the evidence indicated that Hyde's violence was not isolated; he had threatened violence at the Airport on other occasions. For example, in about 1991, while the owner of an aircraft at the Airport was on a taxiway upon returning from an air show, Hyde approached the aircraft in his truck and threatened the owner by leaving the truck with a gun at his side. Hyde left after the aircraft's owner called the police.

Finally, as described above through the evidence of Davis's condition in the hours following the assault (including his pain suffered because of his knocked out teeth and blackened eye) and the medical treatment he required

---

[25] Hyde admits in his brief that he "intentionally, knowingly, struck [Davis] and caused bodily injury to [Davis]."

on the night of the assault and thereafter, Davis's injury from the assault was "substantial"; it was "real" and "significant."

We hold that under the standards given to the jury in its charge and extrapolated by the authority cited above, there was at least legally sufficient evidence to support the jury's affirmative answer to the trial court's malice question because the evidence allowed the jury to form a firm belief that Hyde specifically intended to cause substantial injury to Davis. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2), (7); *Hogue*, 271 S.W.3d at 248–49. Thus, we overrule appellants' sixth issue.

### Testimony about the amount of exemplary damages

In their seventh issue, appellants briefly contend that the exemplary damage award must be reversed because the jury heard "no evidence with regard to any sum appropriate" for the damages.

The decision on the amount of exemplary damages is entrusted to the discretion of the jury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.010(b) (Vernon 2008); *Harris v. Archer*, 134 S.W.3d 411, 436 (Tex. App.—Amarillo 2004, pet. denied) (op. on reh'g). The amount is not susceptible to precise calculation. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006).

38

Specific testimony regarding a proper amount of exemplary damages is not among the six statutory factors that jurors must consider in awarding such damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.011(a) (Vernon 2008). Even among those six factors, the absence of evidence about one of the factors does not render an exemplary damages award invalid. *See Durban v. Guajardo*, 79 S.W.3d 198, 210–11 (Tex. App.—Dallas 2002, no pet.) (holding that evidence of the defendant's net worth, although a statutory factor for the recovery of exemplary damages, is not a necessary element for such recovery). Finally, appellants have not cited any authority that requires a plaintiff to present evidence regarding a specific amount of exemplary damages, and we have not located any such authority.

For these reasons, we hold that Davis was not required to present evidence about a specific amount of exemplary damages, and we therefore overrule appellants' seventh issue.

**The Trial Court's Ruling on Appellants' Post-Trial Motion**

In their eighth and final issue, appellants argue that the trial court erred by failing to grant their post-trial motion for judgment notwithstanding the verdict. But that motion raised essentially the same issues that appellants have raised in this appeal, and in the briefing on their eighth issue, appellants merely reiterate the arguments that they previously made on the issues resolved above.

Thus, for the reasons that we overruled appellants' previous seven issues, we also overrule their eighth issue.[26]

## Conclusion

Having overruled all of appellants' issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, WALKER, and MEIER, JJ.

DELIVERED:  August 13, 2009

---

[26] We note that parties must appeal from judgments, not from orders overruling their post-trial challenges to those judgments. *See Puckett v. Frizzell*, 402 S.W.2d 148, 151 (Tex. 1966).