

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00397-CV

_____

JOHN RUSHING, Appellant

V.

DIVINE HOMES, LLC D/B/A AXIOM BUILDERS, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-305062-18

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

Appellee Divine Homes, LLC d/b/a Axiom Builders (Axiom) sued Appellant John Rushing and JSR International, LLC (JSR) for payment Axiom alleged it was owed after it acted as a project manager on a residential construction project. A jury found that Rushing—in his individual capacity—committed fraud against Axiom and assessed exemplary damages against him. Rushing appeals from the trial court's final judgment which ordered him to pay actual and exemplary damages to Axiom. He raises four points on appeal: (1) the evidence was legally and factually insufficient to support the finding that Rushing acted in his individual capacity; (2) the evidence was legally and factually insufficient to support the finding that Rushing committed fraud; (3) the trial court abused its discretion by prohibiting Rushing's wife from testifying at trial; and (4) the evidence was legally and factually insufficient to support the award of exemplary damages. We will affirm.

## I. BACKGROUND

### A. PRETRIAL FACTS

In March 2018, JSR—of which Rushing was a member and the chief operating officer—was hired as the general contractor to renovate a house that had been damaged by a fire (the Winter Wood project). The house was owned by Jeffrey Weinberg, who was a friend of Rushing's. Weinberg filed an insurance claim and, in a March 13, 2018 written agreement, agreed to pay JSR $129,456.13 to complete the renovations.

2

Rushing and Preston Johns—Axiom's principal—orally agreed for Axiom to be the project manager on the Winter Wood project. After completing the project, a dispute arose over the amount Axiom was owed for its work. Axiom sued Rushing and JSR for fraud, breach of contract, and quantum meruit, seeking actual damages, exemplary damages, and attorney's fees.[1] Axiom alleged that it had invoiced JSR for $48,178.05 in expenses but that JSR had paid only $30,000 of these expenses. Further, Axiom alleged that it was not paid for its work on Winter Wood despite the fact that JSR ultimately profited approximately $62,000 from the project.

Rushing and JSR answered with only an unverified general denial, and they did not bring any counterclaims. In their discovery responses, Rushing and JSR did not disclose Rushing's wife, Sharon Rushing, as a person with knowledge of relevant facts or identify her as a potential witness.

### B. JURY TRIAL

### 1. Defense Witness Discussions

A jury trial was held in August 2021. Before opening arguments and outside the presence of the jury, the parties discussed various preliminary matters with the trial court, including whether Sharon would be allowed to testify as a defense witness. Axiom argued that Sharon should not be allowed to testify because, although she appeared on the defense's trial witness list, she had not been listed as a person having

---

[1]Initially, Axiom also named Weinberg as a defendant but later nonsuited him.

3

knowledge of relevant facts pursuant to Rule 194.2's initial disclosure requirements.[2] The trial court, speaking to Rushing, then stated: "I think [Axiom is] right about that." Rushing responded only that Sharon, if called, would serve as a rebuttal witness. The trial court stated that deciding whether Sharon could serve as a rebuttal witness was premature because no evidence had yet been heard to actually rebut.

On the second day of trial—while Axiom was still presenting its case-in-chief—the issue was raised again, and Rushing explained that Sharon's rebuttal testimony would focus on refuting testimony that Axiom had done "a good job" on the Winter Wood project. Axiom argued that Sharon should not be allowed to testify as a rebuttal witness because she was a "textbook fact witness" who had not been properly disclosed; that her rebuttal testimony was reasonably anticipated and, thus, required disclosure; and that her testimony would be duplicative of her husband's testimony about problems he had seen in Axiom's work.

After hearing the parties' arguments, the trial court stated that it had concerns about Rushing's failures to properly disclose Sharon as a person with knowledge of relevant facts and to plead certain affirmative defenses. But, because Axiom had not yet rested, the trial court stated that it was still "premature" to make a ruling on her

---

[2]Civil procedure rule 194.2 was amended effective January 21, 2021; thus, because the former text applied to these proceedings, all citations in this opinion are to the former rule. *See* Misc. Docket No. 20-9153 at 12-14 (Tex. Dec. 23, 2020).

availability as a witness. The trial court said that Rushing would still "have an opportunity to make [his] record on that after [Axiom] rest[s]."

Later that day, Axiom rested and Rushing presented his case-in-chief. Rushing testified as the only defense witness and then he rested his case.

## 2. Winter Wood Agreement Between JSR and Axiom

Rushing testified that he first worked with Johns and Axiom in 2017 after hiring Axiom to serve as a project manager on a commercial renovation project (the Sandy Lake project). Rushing said that Johns had approached him about Axiom also serving as the project manager on Winter Wood after Johns had learned of the Winter Wood project through a JSR employee. According to Rushing, he and Johns met at a local restaurant in March 2018 to discuss Winter Wood and that Johns acknowledged that Axiom had "messed up" on the Sandy Lake project. In Rushing's telling, Johns proposed that Axiom serve as project manager on Winter Wood to "make things right" for its failings on Sandy Lake.

Rushing outlined the oral agreement with Axiom as he understood it:

[Axiom] find[s] the subs; turn the quotes over to me; turn the bills over to me; I'll get those approved; then once that's done, [Axiom] get[s] 10 percent of whatever got spent right off the board. All [Axiom has] to do is show up, make sure the guys are doing their job and the materials are flowing. That's it.

. . . .

If [Johns] would have sent me all the billing and those estimates, then [JSR would] turn around and cut a check right back to him.

5

Johns, on the other hand, testified that his first knowledge of the Winter Wood project came via a text message from Rushing on January 15, 2018: "Yeah we need to meet Wednesday or Thursday I got a buddy of mine his house burnt down yesterday and we got to do a complete rebuilt it's in Grapevine." He stated that JSR owed Axiom a "large outstanding balance"[3] on the Sandy Lake project and that Rushing had agreed to take no profits from Winter Wood and to pay those profits to Axiom to satisfy the balance owed to Axiom.[4] This agreement also required JSR to pay all of Axiom's Winter Wood expenses. Johns testified that the only reason he agreed to take the Winter Wood job was because Rushing had stated that JSR would take none of the profits.

### 3. Problems Arise On Winter Wood

Rushing testified to numerous problems with Axiom's work on Winter Wood, including issues with sheetrock, plumbing, framing, and unexplained delays. Rushing said that JSR was forced to expend unanticipated labor and money to rectify these issues.

---

[3]On April 12, 2018, Johns texted Rushing: "Do you know when any checks are coming in[?] I'm still totaling everything out but I have over 35k out on [S]andy [L]ake." After Rushing responded, "Ok, as soon as we can get a MEP final," Johns replied, "Sorry, don't mean that negative just a lot out on something that is not our own contracted job."

[4]Rushing denied that JSR owed Axiom money for Sandy Lake and that he had agreed not to take profits on Winter Wood to pay Axiom for Sandy Lake.

Johns testified that all of Axiom's work had passed inspection and explained that many of the delays were brought on by Rushing's failure to provide Axiom with information it needed to complete certain jobs (e.g., paint colors, door hardware, and plumbing fixtures).

An email exchange between Rushing and Johns from July 16–17, 2018, evidenced Rushing's growing frustration with the Winter Wood project. Rushing listed a number of problems and told Johns that Axiom was running behind on the deadline to complete the project by the end of July:

> You had this same problem on Sandy Lake and that cost JSR 22k in delays and extra materials. I wanted to give you the opportunity to do another job for me as this would lead to bigger projects for Axiom. I am trying to make you a Prime contractor but you refuse to oversee your people and get things done in a timely manner. This has got to stop.

Johns responded that he had never been told of the deadline to complete the project by the end of July and that he was still waiting on Rushing to send the final numbers from the Sandy Lake project.

Rushing responded:

> This is the biggest problem you have, you don't follow direction and you don't oversee your people, they have delay after delay because you failed to give them direction and check their work. Now you are trying to hold me hostage on this job because you failed to remember the agreement we had on Sandy [L]ake. Not going to happen, I have another contractor ready to finish this if you fail. **I cannot get paid until you complete. Now this is costing JSR more monies due to delay.**

To this, Johns replied: "I am not going to continue to argue with you. Obviously we are not going to agree on this. I will get this job completed as quickly as possible but I need other things from you."

### 4. Invoice Issues

There were also invoicing issues between the parties. Rushing testified that JSR only received one invoice from Axiom for $1,200.[5] However, JSR paid Axiom $30,000[6] to reimburse Axiom for materials and subcontractors. Rushing explained that JSR made these payments based only on phone conversations with Johns, who orally relayed subcontractor expenses and then promised to send corroborating invoices, but that Axiom never sent such documentation to JSR.

Rushing testified that Axiom did not use the full $30,000 to pay for its expenses but could not say what the money was used for because Johns would never provide a full accounting despite repeated requests by Rushing for such. In Rushing's estimation, JSR had to pay "two or three" of Axiom's subcontractors that should have been paid by Axiom out of the $30,000.

---

[5]Rushing later testified that he received two other invoices but that he "kicked them back" to Axiom because they included expenses for work not done by Axiom and materials not paid for by Axiom.

[6]JSR's trial exhibits showed that the $30,000 had been paid to Axiom in four installments on May 23, June 7, June 18, and July 23, 2018. These are the only payments that JSR sent to Axiom for Winter Wood.

Tami Howard—an Axiom employee responsible for Winter Wood invoices and accounting—testified that Axiom had emailed seven invoices to JSR that accounted for all of Axiom's expenses for materials and subcontractors.[7] She testified that Axiom's software showed that each of these invoices had in fact been sent to JSR and that they totaled approximately $48,000. As for the $30,000 that JSR had paid to Axiom, Howard stated that all of this money had been used to pay for Axiom's subcontractors and materials and that there was no truth to Rushing's contention to the contrary. According to Howard, Axiom was actually "in the hole" on the Winter Wood job to the tune of $18,000. Also, Rushing had never asked Axiom for a full accounting on Winter Wood. It was, according to Howard, just the opposite—that Axiom had repeatedly asked JSR for a full accounting to no avail.

### 5. Axiom Seeks Payment

As work on Winter Wood neared completion in late August 2018, Johns began asking Rushing for JSR's final accounting to determine the total profits on the project. Johns sought this accounting and payment through a series of text messages and emails to Rushing, starting with an email on August 27, 2018:

> Hey John hope all is well. I just wanted to check in with you on winterwood [sic]. Was wondering if you had all the numbers back and wanted to see where everything came in and also when to expect payment. Let me know if you need anything from me.

---

[7]These invoices were admitted into evidence, and Rushing intimated that he may not have seen them because he "get[s] thousands of e-mails every day."

After Rushing did not respond to this email, Johns repeatedly followed-up with Rushing via text messages; and Rushing initially promised that payment was on the way:

(August 28)
**Johns:** "Hey John did you get my email yesterday? It is not like you to [n]ot respond like that. Is everything ok?"
**Rushing:** "Yes at doctors call you later today we had meeting with bank this morning."

(August 29)
**Johns:** "Any update on final totals for winterwood [sic]?"
**Rushing:** "We have an inspection in the morning and should get a check in 48 to 72 hrs after that[.]"

(September 4)
**Johns**: "Any update?"
[No response]
**Johns**: "Do you know what the totals are yet?"
**Rushing**: "We are waiting on them it's been a holiday weekend."

(September 6)
**Johns**: "It is really starting to [c]oncern me that you are not responding to me or calling me back. Typically you always answer or call back very quickly. Please let me know what is going on."
[No response]

(September 13)
**Johns**: "Any update on final payment[?] Do you have the totals yet?"
**Rushing**: "They said check is cut and mailed."

(September 18)
**Johns**: "Any update?"
**Johns**: "What insurance company does he have?"
**Rushing**: "Been in the hospital with tests all day. We received check today and deposited when the clears [sic] we will write yours."

(September 25)
**Johns**: "Any update?"

10

**Rushing**: "Check going out today or morning."
**Rushing**: "Fedex."
**Johns**: "What were all the totals[?]"
[No response]

On October 23, Johns emailed Weinberg to inform him that Axiom had still not been paid and that it intended to file a lien on the Winter Wood project. Weinberg responded that, while he was aware that Rushing had "had challenges with some of [Rushing's] subs," this was not Weinberg's concern because JSR had been fully paid under its agreement with Weinberg.

Despite Johns's efforts to obtain full payment, Axiom only ever received $30,000 from JSR.

## 6. Rushing Alleges Accounting Issues and an Overpayment to Axiom

Instead, on September 26, Rushing started raising issues with Axiom's accounting on Winter Wood:

> (September 26)
> **Johns**: "I would like to meet so we can go through everything."
> **Rushing**: "That's alright Preston my CPA has gone through all [and] we see what has been done."
> **Johns**: "I don't understand why you refuse to show me anything. I have asked several times and you say you will send or [] completely ignore my question."
> **Rushing**: "Show you [] how bad your accounting []is, how you[r] crews over charge, how you bill and then rebill. Hell you don't even look at you[r] own invoices before you send them out. You can't keep a correct running balance and you charge for things you did not do[.] I have had to pay 2k to get this straight[.] I have FedEx your final check and a breakdown and we are done."

In a September 29 email to Johns and Howard, Rushing further explained these accounting issues and alleged that JSR had actually overpaid Axiom on Winter Wood.

11

In that email, he explained that this overpayment came to his attention after the completion of "an in[-]depth certified accounting." He then listed ten expenses that JSR had been required to pay to rectify mistakes allegedly caused by Axiom's subcontractors. The email described Axiom's accounting as "arduous at best and so incorrect," but it also acknowledged that—aside from one invoice—Axiom had indeed sent final invoices for its expenses. Rushing demanded that Axiom send a check for more than $10,000 to cover this alleged overpayment.

On October 2, Howard sent a lengthy reply to Rushing's September 29 email, explaining in detail each of the ten expenses complained of by Rushing. She wrote that she was surprised by Rushing's email and the alleged overpayment and that if he had "had any questions regarding the invoicing during the [Winter Wood] remodel [she] would have been happy to answer them." The key takeaways from Howard's reply were that:

- The invoices paid by Axiom to its subcontractors "completely match[ed]" the invoices that Axiom then sent to JSR;

- Even with the additional expenses cited by Rushing, the Winter Wood project was under budget except for an overage of $1,174 for framing and a few other expenses that Rushing had explicitly approved; and

- She could not understand how a certified accounting of the project had been completed when JSR had never requested access to Axiom's books.[8]

---

[8]In her email, Howard also addressed the past issues concerning Sandy Lake, writing that "[s]everal months ago [Rushing] contacted [Johns] saying he was overwhelmed with work." She added that Johns had, thus, agreed to help with Sandy

12

Howard testified that, despite asking Rushing for a meeting to resolve these issues, he never responded to her, and JSR never supplied Axiom with evidence of the certified accounting or of any accounting for Winter Wood.[9]

Having received no response to Howard's email, Johns emailed Rushing again on October 23. This email detailed Johns's protracted efforts to obtain accounting information and payment from Rushing. It reiterated that the Winter Wood project had, except for a few expenses, been completed under budget and that the agreement had been for Axiom to receive all profits to reimburse it for the balance owed on Sandy Lake. Johns's email continued:

> Axiom Builders came in[]to the Sandy Lake job after the foundation had already been poured. The project was then completed, with some delays, but finished and everyone was happy. When the job was wrapping up I sent you all of our expenses with receipts for your records (4/14) totaling $26,383.75 [and] that total was without profit or overhead. During that time, you told me that you would be refinancing your house to help make up the balance. Then on 7/10 I sent you an email, while you were out of town, following up on the balance from Sandy Lake. On 7/16 you told me how I cost you (JSR) 22k on Sandy Lake. I had sent everything Axiom Builders spent plus receipts to verify.

Lake and, subsequently, to take on the Winter Wood job to recoup what was owed Axiom from Sandy Lake.

[9]Rushing testified that he never gave a final accounting to Johns because those numbers were "none of his business."

### 6. Insurance Payments and JSR's Profits

JSR and Weinberg agreed that JSR would be paid a total of $129,156.13 through five installments as the Winter Wood project progressed. The insurance company made five direct payments to Weinberg on his Winter Wood claim: (1) $13,117.81 on January 19, 2018; (2) $139,918.62 on February 13, 2018; (3) $7,091.14 on June 7, 2018; (4) $2,000.00 on August 16, 2018; and (5) $31,374.64 on August 16, 2018. Ultimately, Weinberg paid JSR the full agreed amount of $129,156.13, though it is not clear from the record exactly when JSR was paid or if JSR was paid in progressive installments as contemplated by their agreement.[10]

However, on August 27, 2018, JSR charged Weinberg a 5% late fee on an invoiced balance of $43,810.67. At trial, Rushing could not recall the specific invoice upon which the late fee was based but testified that JSR typically charges late fees after a payment is sixty days late. When asked directly if the invoice in question was issued to Weinberg on June 27, 2018, Rushing changed his testimony and said that late fees are also sometimes charged after only thirty days of nonpayment because "each job is different."

Rushing never informed Johns that any of these insurance payments had been made to Weinberg or that JSR had sought payment from Weinberg before work on Winter Wood had been completed. Johns testified that Rushing lied in his July 17

---

[10]JSR acknowledged in a waiver of lien rights that it had been fully paid by September 15, 2018.

email when he claimed that JSR could not get paid until Axiom completed the Winter Wood job. Johns said that, had he known "the truth of what was going on," Axiom would not have continued with the Winter Wood project. But, relying on Rushing's statement, Axiom remained on the project, which caused it "to go more in the hole."

In the end, JSR paid approximately $67,000 in total expenses—including the $30,000 paid to Axiom—on Winter Wood and made approximately $62,000 in profits. Axiom incurred approximately $48,000 in expenses for which JSR paid $30,000, and Axiom received none of the profits.

## C. VERDICT, JUDGMENT, MOTION FOR NEW TRIAL

The jury found that JSR and Rushing had breached their agreement with Axiom, that Rushing individually had committed fraud against Axiom, and that there was clear and convincing evidence that Axiom's injury resulted from that fraud. Axiom elected to recover against Rushing for fraud and, based on the jury's assessments, the trial court signed its agreed final judgment awarding Axiom actual damages of $61,572.86; exemplary damages of $40,000; and interest and costs. Rushing filed a motion for new trial in which he complained only that there was "no evidence" to support various of the jury's findings. He did not complain that the evidence was factually insufficient. The motion was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). This appeal followed.

## II.  DISCUSSION

### A.  LEGAL AND FACTUAL INSUFFICIENCY POINTS

In points one, two, and four, Rushing argues that the evidence was legally and factually insufficient to support (1) the finding that he acted in his individual capacity rather than as an officer of JSR, (2) the finding that he committed fraud against Axiom, and (3) the jury's exemplary damages award.  However, because Rushing did not properly preserve error related to the factual sufficiency of the evidence, we can only consider his legal sufficiency challenges.

### 1.  Factual Sufficiency Points Waived

Factual sufficiency complaints must be raised in a motion for new trial in the trial court as a prerequisite to bringing such complaints on appeal.  Tex. R. Civ. P. 324(b).  Failure to do so results in waiver of the complaint.  *In re A.J.L.*, 136 S.W.3d 293, 301–02 (Tex. App.—Fort Worth 2004, no pet.); *see Brazosport Bank of Tex. v. Oak Park Townhouses*, 889 S.W.2d 676, 682 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (holding that factual sufficiency challenge was waived when the motion for new trial raised only no-evidence challenge); *see also Hardy v. C. P. I. Sales, Inc.*, 511 S.W.2d 89, 93 (Tex. App.—Houston [1st Dist.] 1974, no writ) ("A legal sufficiency assignment cannot be enlarged on appeal to embrace a factual sufficiency point of error, or vice versa.").

Rushing's motion for new trial raised only no-evidence—or legal sufficiency—challenges to the evidence.  *See SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 247

16

(Tex. App.—Texarkana 2005, no pet.) ("Appellants' argument that there is no evidence to support the jury's award raises the legal sufficiency of the evidence."). Accordingly, all complaints related to the factual sufficiency of the evidence have been waived, and we cannot consider them. *See* Tex. R. Civ. P. 324(b).

## 2. Legal Sufficiency Points

### a. Standard of review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003). More than a

17

scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gunn*, 554 S.W.3d at 658. On the other hand, no more than a scintilla exists when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). A fact is established by circumstantial evidence when it can be fairly and reasonably inferred from other facts proved in the case. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995). But to withstand a legal-sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Id.*; *see City of Keller*, 168 S.W.3d at 810–11, 813–14 (explaining standard of review in circumstantial-evidence cases and clarifying that, "[i]n claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists").

### b. Rushing could be held individually liable

In his first point, Rushing argues that the evidence was legally insufficient to prove that he acted in his individual capacity rather than as an officer of JSR when he made the alleged misrepresentations to Axiom. He further argues that Axiom failed to plead alter ego or piercing the corporate veil and that no evidence was presented to

18

prove a finding on either theory. Thus, according to Rushing, he could not be found individually liable for fraud. We disagree.

It is well settled in Texas that a corporate agent can be held individually liable for his own fraudulent statements or knowing misrepresentations "even when they are made in the capacity of a representative of the corporation." *Alexander v. Kent*, 480 S.W.3d 676, 698 (Tex. App.—Fort Worth 2015, no pet.) (internal quotations omitted). Thus, a plaintiff need not pierce the corporate veil or plead alter ego to hold an officer individually liable for his own fraudulent statements. *Id.*; *see Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.) ("The issue of a defendant's liability in his individual capacity is distinct from that of his liability under an alter ego theory."); *Heafner & Assocs v. Koecher*, No. 01-91-01075-CV, 1994 WL 389030, at *14 (Tex. App.—Houston [1st Dist.] July 28, 1994, writ denied) ("Alter ego . . . is a means of imposing individual liability *where it would not otherwise exist* . . . ." (emphasis added)).

Here, Axiom pleaded fraud against Rushing individually, alleging that Rushing himself made certain fraudulent misrepresentations to Axiom. Thus, Rushing could be held individually liable for fraud without Axiom needing to plead or prove theories of piercing the corporate veil or alter ego. *See Alexander*, 480 S.W.3d at 698; *see also Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926, 929–30 (Tex. App.—Houston [14th Dist.] 1982 writ ref'd n.r.e.) (holding that if a defendant is sued individually along with his corporation and there is no verified denial, individual liability may be found absent

a theory of alter ego). And, as we explain below, the evidence was legally sufficient to support the jury's fraud finding against Rushing individually.

For these reasons, we overrule Rushing's first point.

### c. Evidence of fraud was legally sufficient

In his second point, Rushing argues that no evidence supported the jury's finding that he committed fraud against Axiom. Axiom posits that the evidence showed two instances of fraud. First, that Rushing fraudulently induced Axiom into taking the Winter Wood project by telling Johns that JSR would take no profits from Winter Wood so that Axiom could be fully paid for Sandy Lake. Second, that Rushing fraudulently induced Axiom into remaining on the Winter Wood project and incurring additional expenses by telling Johns in the July 17 email that JSR could not get paid until Axiom completed the job. We will overrule this point because the evidence was legally sufficient to prove at least the first of these fraud theories.

### 1. Relevant law

A person commits fraud by (1) making a material misrepresentation; (2) that the person either knows to be false or asserts recklessly without knowledge of its truth; (3) with the intent that the misrepresentation be acted upon; (4) and the person to whom the misrepresentation is made acts in reliance upon it; (5) and is injured as a result. *W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 776 (Tex. App.—Fort Worth 2008, pet. denied). "[A] promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of

20

performing at the time it was made." *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

Breach of contract alone is insufficient to show an intent not to perform, but breach combined with even slight circumstantial evidence of fraud is some evidence of fraudulent intent and enough to support a fraud verdict. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009); *see Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence."). Intent is determined at the time the representation is made but may be inferred from the person's past or subsequent acts, motive, or related wrongful acts. *Spoljaric*, 708 S.W.2d at 434; *Strange*, 256 S.W.3d at 776. "Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made" but "that fact is a circumstance to be considered with other facts to establish intent." *Spoljaric*, 708 S.W.2d at 435. A person's denial that he ever made a promise is a factor that can show that he had no intent to perform at the time he made the promise; so, too, is a total lack of pretense to perform. *Id.*; *Chicago, T. & M.C. Ry. Co. v. Titterington*, 19 S.W. 472, 474 (Tex. 1892) (explaining that evidence of a promise made with the intention of inducing a party into an agreement coupled with "utter failure and refusal to perform the promises" could support a finding of fraud).

## 2. Legally sufficient evidence existed that Rushing made a promise he never intended to keep and that Axiom relied on that promise to its detriment

Thus, we must determine whether there was more than a scintilla of evidence to show (1) that Rushing made a promise of future performance to Axiom that, at the time he made it, he had no intention of performing; and that (2) Axiom relied on that promise to its injury. *See Aquaplex*, 297 S.W.3d at 775.

The record contains evidence that Rushing promised that JSR would not take profits on Winter Wood and would pay those profits to Axiom so that Axiom could recoup its losses from Sandy Lake and that Axiom relied on that promise to its detriment. Johns testified that Rushing had represented to him that JSR would not take profits from Winter Wood so that JSR could pay Axiom for its work on Sandy Lake. Johns said that he relied on this representation and that without it Axiom would never have agreed to take on the Winter Wood project. And both Johns and Howard testified that Axiom ended up losing money on Winter Wood after JSR failed to reimburse Axiom for its expenses and failed to pay Axiom any of the profits. This is more than a scintilla of evidence that Rushing made a promise to Axiom and that Axiom relied on it to its injury.

This leaves us with a more difficult question: was there more than a scintilla of evidence that when Rushing made this promise he had no intention of performing it? *Id.* Considering all of the evidence and indulging every reasonable inference in

support of the jury's fraud finding, we hold that there was. *See Gunn*, 554 S.W.3d at 658.

Rushing explicitly denied that he had promised that JSR would not take profits from Winter Wood or that those profits would be used to pay Axiom for JSR's remaining debt from Sandy Lake. *See Spoljaric*, 708 S.W.2d at 435. And he made no pretense to ever perform such a promise. *See id.* In fact, the opposite was true: while there was evidence that JSR endeavored to obtain payments from Weinberg starting in at least July 2018 and eventually did profit more than $60,000, no effort was ever made to pass along any of those profits to Axiom. Rushing insisted that he had only ever agreed to pay Axiom a profit of ten percent of Axiom's invoiced expenses. He testified that he had agreed that, once Axiom submitted its expenses to him, he would "get those approved" and "turn around and cut a check right back to [Axiom]" for that ten percent. But JSR never paid any amount of profit to Axiom, despite clear evidence that Axiom submitted invoices to JSR as early as March 2018. From this evidence, it was reasonable to infer that Rushing had always intended for JSR to keep the profits on Winter Wood rather than to use those profits to pay Axiom. This alone is enough to support the jury's finding of fraud. *See id.*

But there is more. From May to July 2018, JSR faithfully paid Axiom's invoiced expenses for the Winter Wood project. However, in late August 2018—when the project was nearly complete—the payments had ceased and Johns began asking Rushing for a full accounting of the project. For nearly a month, Rushing

23

assured Johns that he would soon send the numbers and payment to Axiom. Then, Rushing's story changed, and for the first time, he alleged that JSR had actually overpaid Axiom and that Axiom needed to refund JSR more than $10,000. Despite Johns and Howard pressing to meet with Rushing and asking that he supply documentation explaining the alleged overpayment, no meeting occurred and no documentation was provided. And, through all of this, Rushing failed to inform Axiom that the bulk of the insurance payments had been issued to Weinberg by February 2018 and that JSR had been actively seeking payment from Weinberg out of those proceeds.

From this evidence, it is reasonable to infer that Rushing intended to pay Axiom only long enough to ensure completion of the project—and, thus, ensure that JSR would receive full payment from Weinberg. And it is also reasonable to infer that Rushing then devised the alleged overpayment as a red herring, kept Axiom in the dark about the insurance payments, and refused to send a full accounting to Axiom so as to hide and keep the profits for himself—as he intended all along.

These inferences draw some weight from Rushing's prior dealings with Axiom. Johns contended that Rushing had previously, on the Sandy Lake project, failed to reimburse Axiom for its expenses or to pay its promised profits. Johns's October 23 email and text messages between him and Rushing outlined a sequence of events in the Sandy Lake project remarkably similar to those that occurred on Winter Wood: as Sandy Lake neared completion in April 2018, Johns submitted Axiom's final invoices

seeking payment from JSR; by July, those invoices were still unpaid, and instead of paying them, Rushing began asserting that JSR owed Axiom nothing; and Axiom was never fully paid. This evidence raises a history of nonpayment between JSR and Axiom—aided along by Rushing's unverified, eleventh-hour claims that Axiom was owed nothing—from which it would be reasonable to infer that Rushing likewise never intended to fully pay Axiom on Winter Wood or to use those profits as promised.

Further, evidence showed that Rushing had indicated to Johns that he was overwhelmed with work and was going to refinance his house "to help make up the balance" on Sandy Lake. Weinberg also alluded to the fact that Rushing was having "challenges with some of [Rushing's] subs." It is reasonable from this evidence to infer that Rushing was struggling to make ends meet and would, thus, have been motivated to take on the Winter Wood project with the intention of keeping its full profits regardless of any contrary representations made to Johns.

Finally, despite Rushing's allegations that Axiom had been grossly overpaid for its work on Winter Wood—and had even misappropriated some of the $30,000 meant to cover its expenses—neither Rushing nor JSR asserted any counterclaims against Axiom to recover this money. A reasonable factfinder could have deduced from this that Rushing alleged the overpayment not because it was truly actionable but to help him hide the profits from Axiom.

In light of this evidence and the reasonable inferences that can be drawn from it, we hold that there was more than a scintilla of evidence that Rushing, when he promised that JSR would take no profits in order to pay Axiom for JSR's Sandy Lake debt, did not intend to perform on that promise. We overrule Rushing's second point.

### d. Exemplary damages

In his fourth point, Rushing argues that the evidence was legally insufficient to support the award of $40,000 in exemplary damages for fraud because no clear and convincing evidence was presented "demonstrating outrageous, malicious, or otherwise reprehensible conduct by John Rushing."[11] We overrule this point.

To be entitled to exemplary damages, a plaintiff must prove by clear and convincing evidence that the harm for which it seeks recovery of exemplary damages resulted from the fraud, malice, or gross negligence of the defendant. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). "In reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, an appellate

---

[11]Though not entirely clear from Rushing's brief, it appears that he might also be challenging the exemplary damages award on the basis that it exceeded the exemplary damages cap delineated in Section 41.008 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (providing that exemplary damages may not exceed the greater of either (1) two times the economic damages plus noneconomic damages not exceeding $750,000 or (2) $200,000). Because Axiom was awarded $61,572.86 in actual damages, the exemplary damages award of $40,000 is well within this statutory cap. *Id.* Thus, to the extent that Rushing has raised this argument, we overrule it.

court must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005) (internal quotations omitted). A court must conclude that the evidence was legally sufficient unless it determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proven was true. *Id.*

First, Rushing has waived this point for inadequate briefing because he has not identified any law relevant to this case. Tex. R. App. P. 38.1(h),(i). He erroneously claims that, for Axiom to have been entitled to exemplary damages, it was required to prove (1) outrageous, malicious, or otherwise reprehensible conduct by Rushing and (2) that Rushing specifically intended for Axiom "to suffer substantial injury that was 'independent and qualitatively different' from the compensable harms associated with the underlying causes of action." To support these contentions, Rushing cites two inapplicable Texas Supreme Court cases. *See Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 659–61 (Tex. 2012) (explaining the requirements for obtaining exemplary damages in tort cases not involving fraud); *Transp. Ins. Co. v. Moriel*, 879 S.W. 2d 10, 19 (Tex. 1994) (explaining the requirements for obtaining exemplary damages in bad-faith insurance cases not involving fraud). Because Rushing cites no legal authority relevant to this case and asks that we analyze the facts under an inapplicable legal standard, he has waived this point due to inadequate briefing. *See* Tex. R. App. P. 38.1(h),(i); *Velasquez v. Waste Connections, Inc.*, 169 S.W.3d 432, 436 (Tex. App.—El Paso 2005, no pet.)

27

("Because Velasquez's argument does not contain a single reference to a relevant case or legal principle, the issues are not adequately briefed and are considered waived.").

Further, even had the point been properly briefed, we would overrule it because, for the reasons already thoroughly explained, we cannot conclude that no reasonable factfinder could have formed a firm belief or conviction from the evidence that Rushing's fraud harmed Axiom. *See Hall*, 168 S.W.3d at 170; *see also Strange*, 256 S.W.3d at 781 (holding that legally sufficient evidence supporting fraud claim was also legally sufficient to support award of exemplary damages under the heightened clear-and-convincing standard). For these reasons, we overrule Rushing's fourth point.

## B.  SHARON AS TRIAL WITNESS

Finally, in his third point Rushing contends that the trial court erred by "not allowing [Sharon] to testify in this cause." We overrule this point because Rushing did not preserve it for appellate review. *See* Tex. R. App. P. 33.1(a).

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must also get a ruling—either express or implied—from the trial court. Tex. R. App. P. 33.1(a)(2)(A), (b); *see Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex.

28

2002).  If the trial court refuses to rule, the party preserves error by objecting to that refusal.  Tex. R. App. P. 33.1(a)(2)(B).  If the trial court does not rule and the party does not object to the refusal to rule, error is not preserved.  *Id.*

The record shows that the trial court never ruled on whether Sharon could testify as either a fact or rebuttal witness for the defense.  Though the trial court raised concerns that Sharon was unavailable as a fact witness because she had not been properly disclosed pursuant to Rule 194.2, it also explicitly explained on multiple occasions that a ruling on her availability was premature because Axiom had not yet rested its case.  Rushing did not object to or otherwise refute these statements by the trial court nor did he ever seek a ruling on whether she could testify.  In fact, Rushing never attempted to call Sharon as a witness at all; he rested having called only himself to testify.

For these reasons, we overrule Rushing's third point.

### III.  CONCLUSION

Having overruled all of Rushing's points, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  February 9, 2023

29